# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **RONALD KNIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:16-CV-218-VEH** |
| | ) | |
| **GENERAL TELECOM, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a civil action filed by the Plaintiff, Ronald Knight, against the Defendant, his former employer, General Telecom, Inc. ("GTI"). The Complaint alleges that: the Plaintiff was fired (and not reinstated) by the Defendant, because of his disability, diabetes, in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12111-12117 (the "ADA") (Count One); the Defendant failed to accommodate the Plaintiff's disability in violation of the ADA (Count Two); and, after his termination, the Defendant failed to give the Plaintiff the required notice of his rights pursuant to 29 U.S.C. § 1166(a), of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") (Count Three).

The case comes before the Court on the Defendant's motion for summary judgment on all counts (doc. 23), and the Plaintiff's motion for summary judgment

as to Count Three, the COBRA Claim (doc. 31). For the reasons stated herein, both motions will be **GRANTED in part** and **DENIED in part**.

## I.      STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which

are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.  FACTS[1]

### A.  GTI

GTI installs and maintains electric equipment and towers for cellular telephone communications customers including AT&T, Verizon, Sprint, T-Mobile, Ericsson, and, in the past, General Dynamics. The parties agree that, at all relevant times, GTI employed 19-24 employees. (Doc. 24 at 5, ¶2 (not disputed by Plaintiff)). However, the record contains evidence that GTI "employed 31 full-time employees on July 18, 2014, [and] 27 full-time employees on July 17, 2015." (Doc. 31-1 at 17).[2] All but four

---

[1] The facts set out herein are gleaned, in substantial part, from the facts proffered by the parties. To the extent that a party has proffered a fact which is not disputed, it has been included herein exactly as it was proffered, without citation. To the extent that a fact proffered by a party was disputed by another party, the Court first examined the proffered fact to determine whether the evidence cited in support of that fact actually supported the fact as stated. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact as proffered, with citation to the evidence supporting the fact as proffered. If the cited evidence was disputed by contrary evidence, the evidence was viewed, as this Court must, in the light most favorable to the non-movant, with citation to such supporting evidence. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant and/or immaterial, may have been omitted. Further, as necessary, the Court may have included additional facts cast in the light most favorable to the non-movant.

[2] In his own motion for summary judgment, the Plaintiff points out the discovery responses which demonstrate the higher number of employees. (*See* doc. 31 at 7, ¶15). The inconsistency between what the Plaintiff failed to dispute from the Defendant's proffer, and his own proffer, may be due to the confusing manner in which the Defendant set out facts in support of its own motion for summary judgment. The Defendant sets out only 14 numbered facts. However, many facts have "subfacts" within them. In response, the Plaintiff renumbered the facts and responded accordingly. (*See* doc. 34-1 at 5-18; doc. 33 at 4-8). The Court has attempted to keep this in mind when drafting the statement of facts in the light most favorable to the non-movant, while also understanding that these are "cross" motions for summary judgment.

GTI employees spent most of their time completing work for customers in the field. All GTI employees worked in the field from time-to-time. Individuals employed by GTI had different skill sets, and would perform different duties based on customer needs.

At all relevant times, GTI employees have been required to adhere to policies in GTI's Employee Handbook, which GTI distributes and explains to all of its employees. GTI's Handbook includes Equal Opportunity and Americans with Disabilities Act policies, which, *inter alia*, call for reasonable accommodation of employee disabilities and strictly prohibit discrimination in all employment terms and conditions based on an employee's disability. Also, pursuant to GTI's Employee Handbook, employees are subject to discipline up to and including termination, for: poor job performance, unsatisfactory quality or quantity of work, failing to follow instructions or company procedure, failing to meet safety expectations, insubordination or refusal to perform work, disorderly conduct or acts of violence, misusing or destroying company property, and using illegal drugs or reporting to work under the influence of same.

Accordingly, when the Court has been made aware of facts which dispute certain "admitted" facts, it does not deem those facts to be admitted.

## B.    Ronald Knight

Knight was employed by GTI as a "helper" from April 2006 until his termination on June 24, 2015. The duties of a helper include generator installation, simple directed wire splicing, and ditch digging.

Knight was diagnosed with Type 2 diabetes in 2012. He takes metformin to control his diabetes and also takes medication for diabetic nerve damage in his feet. His diabetic condition constrains his diet, limiting the foods he is able to eat. Knight has to eat in order to keep his blood sugar up so that he can work.

### 1.    *Knight's Training, Certifications, and Abilities*

Knight can only read "some" and cannot write. (Doc. 25-2 at 9(29); doc. 25-1 at 2, ¶8.b.). It is undisputed that Knight was never certified to perform tower climbs because he feared heights. Further, he obtained no industry or other certifications, and he did not attend any training or classes in the telecommunications field.

At all relevant times in this case, Knight reported to GTI's Chief Financial Officer Dr. Lee Chamoun, and Field Manager Jeff Bowerman.[3] Chamoun states in his affidavit that:

---

[3] Technically Knight also reported to GTI's President <u>Joe</u> Chamoun. However, to avoid confusion, and because very few relevant facts in this case concern Joe Chamoun, the Court omits any reference to him at this time. Simple references to "Chamoun" should be construed to mean Dr. Lee Chamoun.

Ron's skill set was the smallest of all employees who worked for the Company; coworkers reported occasions in which he aggressively declined to learn how to follow blueprints and perform even the simplest tasks, and he never pursued training opportunities.

(Doc. 25-1 at 5, ¶12.b.). Accordingly, "[Knight's] skills were confined to digging ditches and following specific A-B-C instructions on what wire to place where." (Doc. 25-1 at 3, ¶8.c.) Bowerman who has "worked with Ronald Knight for approximately twenty years," and who was Knight's supervisor at GTI, states the following in his declaration:

At GTI, Ronald Knight was typically assigned work tasks such as running pipe and simple electrical wiring. Mr. Knight's skills and job knowledge were limited in comparison to other employees under my supervision. Based on my observation, Mr. Knight was not able to read and/or write and did not have any desire to learn new technologies or skills. To my knowledge, Mr. Knight never expressed interest in attending training or classes to advance in the telecommunications field.

Because Mr. Knight was limited with regard to job skills and knowledge, I had to assign him to jobs that offered simple electrical work tasks. Unlike employees such as Michael Jones, Mr. Knight could not perform technical electrical tasks such as integration and fiber optic work on telecommunications job sites.

(Doc. 25-7 at 2, ¶¶5-6). Michael Jones, who worked with Ronald Knight "from approximately 2009 until [Knight's] employment ended," stated:

[Knight's] skills and knowledge of how to properly perform work tasks was very limited. Unlike other GTI employees, Ronald Knight did not actively keep up with changes and technology so that he could add value to the company. Instead, Ronald Knight was only capable of performing

specific manual labor and simple electrical tasks.

(Doc. 25-9 at 2, ¶¶6, 7).

Due to Knight's inability to communicate effectively in writing, GTI management primarily communicated with him verbally. However, there is evidence that Knight does communicate via text message. (Doc. 25-2 at 20(74); doc. 34-2).[4] Still, Knight's wife, Kimberly Knight ("Mrs. Knight"), typically communicated with GTI on Knight's behalf when something had to be completed in writing.

### 2. *Knight's Work Efficiency Issues*

At all pertinent times, Knight understood that completing projects and contract work quickly and efficiently was a top priority for GTI. In his deposition, Knight testified: "[N]obody talked to me about work performance or anything. I've always worked hard, always did my job, and I always did the best I could." (Doc. 25-2 at 39(151)). However, his co-workers and supervisors saw things differently.[5] In his

---

[4] Knight did not communicate with management through e-mail because he could not use a computer and did not know how to communicate using a computer. (*See* doc. 25-2 at 20(74)).

[5] The quoted sections of the declaration testimony which follow are referenced in the "facts" section of the Defendant's brief in support of its motion. (*See* doc. 24 at 8, ¶¶9 - 9.a., and evidence cited). The Plaintiff disputes none of the incidents described in this material, instead writing:

Defendant never documented alleged coworker complaints or reports to management prior to Plaintiff's termination; a reasonable jury could find that the unsigned writeups were created by Chamoun after Plaintiff was fired. (EX 3, 4). The emails from General Dynamics make no reference to Plaintiff. (Doc. 25-1 p. 46-36).

affidavit, Chamoun states that:

> Ron was not efficient with the few skills he possessed when compared to other employees at a time when a decision had to be made. . . . Reports persisted that Ron's work was beyond slow; he took 3 to 4 times longer to perform simple tasks than did others, and he was reported by co-workers as having taken extended breaks smoking in posted restricted areas after being told not to smoke in restricted areas previously.

(Doc. 25-1 at 5, ¶12. a.). Knight testified that he knows nothing about who might

have made any such reports, when reports might have been made, or any specifics

regarding same. (Doc. 25-2 at 38(145-146)).

Chris Howard was a "Lead Fieldman" responsible for supervising and directing

Knight's work. He stated:

> Though Mr. Knight and I were employed at GTI for many years, we only worked together on projects and at job sites during approximately the last six months of his employment. During that period, Mr. Knight and I worked on numerous generator installation projects. Mr. Knight typically was assigned to perform electrical work on projects.

> [] Based on my experience working with Mr. Knight, I would assess his job performance as subpar. He would either take way too long to complete a task or would breeze through it and do it incorrectly. For example, I remember it taking Mr. Knight approximately 20 minutes to complete tasks that generally take 2 hours. Mr. Knight also took extended restroom and other breaks while GTI employees were

---

(Doc. 33 at 5). However, these writeups are nowhere mentioned in the sections cited. Also, it is unclear to which "General Dynamics emails" the Plaintiff is referring, since the citation appears to be a typo. Regardless, like the write-ups, the emails are not referenced in the sections cited by the Plaintiff.

performing work and would only reappear when the assigned work tasks were at or near completion. In addition, Mr. Knight frequently stood around [job sites] and smoked cigarettes while other GTI employees performed assigned work.

[] I frequently counseled Mr. Knight regarding his slow and poor job performance. For example, while on a job in Mississippi installing a power bay, Mr. Knight took approximately 18 hours to complete 30 minutes of work. During the project, I requested that he speed up and finish the work he was performing. Mr. Knight, however, refused to do so. On other occasions, I told Mr. Knight he would need to redo certain electrical work that did not meet GTI or the customer's quality standards and expectations. Mr. Knight, however, refused to redo such work and I or some other GTI employee would redo it before leaving the [job site].

[] When I worked with Mr. Knight, he took more frequent and longer breaks than any other GTI employees. . . . I would estimate that Mr. Knight spent approximately 75% of his workdays on break.

[] In May/June 2015, Jeff Bowerman discussed with me why my group was not working as efficiently as expected and completing job projects and work in a timely manner. In response, I requested that Jeff Bowerman visit the job site and observe and assess for themselves the performance of employees under my supervision. As requested, Jeff Bowerman visited the job site where my crew was working and observed the work of myself, Nicholas Gotay, and Mr. Knight.

(Doc. 25-8 at 2-3, ¶¶6-10).[6]

Bowerman stated the following in his declaration:

In May-June 2015, GTI learned that the work crew led by Chris Howard, which included Chris Howard, Nicholas Gotay, and Ronald

---

[6] In his deposition, the Plaintiff testified that <u>he</u> asked Bowerman to come out "and see what was taking so long on the job sites." (Doc. 25-2 at 38(146)).

Knight at the time, was taking a long time to complete projects. I talked with Chris Howard about his crew's efficiency and he requested that I come observe his crew's work so that I could see for myself what the issue was. On June 12, 2015, and at other times, I observed Mr. Knight working very slowly with no enthusiasm and poor work ethic. For example, I watched Mr. Knight smoke cigarettes while Chris Howard and Nicholas Gotay dug a ditch. I discussed with Mr. Knight that he needed to help his crew perform assigned work in a timely and efficient manner.[7] I continued to observe Mr. Knight's performance and counsel him regarding his need to improve; however, his performance did not improve and he showed no desire or willingness to perform GTI's work.

---

[7] The Plaintiff states that Bowerman actually said "if we can't get these jobs done in ten hours, then he's going to have to hire somebody else." (Doc. 25-2 at 38(148)). Furthermore, in his deposition, Knight denied ever having been counseled about or disciplined for anything, or having had any rules discussions with anyone. (Doc. 25-2 at 34(129)). He stated that he has always followed the rules. (Doc. 25-2 at 26(98)). The following discussion took place during Knight's deposition:

Q.      All right. During your employment at General Telecom, do you remember receiving counseling for performance and rules violations?

A.      No.

Q.      Nobody ever counseled you about anything?

A.      No.

Q.      Nobody ever disciplined you for anything?

A.      No.

Q.      Nobody ever discussed rules violations with you?

A.      No.

(Doc. 25-2 at 33(128)-34(129)). However, elsewhere in his deposition he testified that a week before he was fired Janis Rosser had called him regarding smoking on GTI property. (Doc. 25-2 at 28(106-107)). Also, Knight agreed that Chamoun had spoken to him about his positive test for marijuana in March of 2014. (Doc. 25-2 at 30(116)).

(Doc. 25-7 at 3, ¶12). Bowerman also stated:

> Employees frequently complained to me about working with Ronald
> Knight. For example, Barry Key, Brandon Reno, Len Bracken, Mike
> Jones, Chris Howard, Justin Bowerman, Scylar Stephenson, and Nick
> Gotay all raised concerns and complained to me about working with
> Ronald Knight because of his poor work performance, attitude, and
> ethic. While Mr. Knight was employed by GTI, I tried to assign
> employees who did [not] want to work with Mr. Knight to alternative
> projects with other Field Technicians as best possible.

(Doc. 25-7 at 2, ¶7). Bowerman noted that "employees including Chris Howard and

Len Bracken reported to me that Mr. Knight had used marijuana while on-the-clock

at GTI.[8] After the reports of drug use, Mr. Knight refused to take a drug test and told

me that he would never stop smoking marijuana." (Doc. 25-7 at 2, ¶8).[9]

Len Bracken stated the following in his declaration:

> Based on my experience working with Ronald Knight on a daily basis,
> his performance was very poor. Ronald Knight was extremely slow in
> performing simple work tasks and would spend a large amount of his
> time during the shift finding ways to keep from performing required
> work. For example, Mr. Knight frequently and constantly made walks
> to our work truck for tools or water while the rest of the crew was
> performing manual labor. In addition, Mr. Knight often stood around on
> a job site and watched others perform work. Mr. Knight would try to cut
> corners on work quality in order to complete job tasks as quickly and
> easily as possible. I knew and understood that whenever I was assigned

---

[8] In his deposition, the Plaintiff denied that he ever smoked marijuana on a job site or at a
GTI facility. (Doc. 25-2 at 24(91)).

[9] It is unclear as to when this allegedly occurred. Absent more specifics, a jury could
reasonably conclude that Bowerman is referencing only the incident which occurred after the
Plaintiff passed out on June 9, 2015, discussed *infra*.

to a [work site] with Mr. Knight that he would not perform an equal load of the required work and therefore I would need to work at a quicker pace so that we could finish the job in a timely fashion.

[] On one occasion while working with Ronald Knight at a [job site] in Georgia, Mr. Knight was assigned to perform simple grounding work on a generator disconnect. Though this particular work task typically takes approximately 15 minutes to complete, Mr. Knight spent approximately 2 hours working on it. While performing other work duties, I watched Mr. Knight and noticed that he was working very slowly on this simple task. As a result and because Mr. Knight was my partner, I had to complete other work duties and tasks on the [job site] that Mr. Knight could have performed himself had he finished the grounding work in a timely manner.

(Doc. 25-6 at 2, ¶6-7).

Michael Jones stated that:

[u]nless we know the job site will be close to somewhere we can eat, GTI employees typically bring lunch so that we can eat quickly and continue working to complete the job. Ronald Knight, however, refused to bring lunch with him. I believe that he refused to bring lunch so that he [could] request to stop working and take a lengthy lunch break.

(Doc. 25-9 at 2-3, ¶9).[10] Jones also described Knight's job performance as "generally poor," and stated that Knight "often refused to perform certain assigned work and job tasks," and "often would disappear from the [work site] for lengths of time." (Doc. 25-9 at 2, ¶8). Jones also noted that he "personally saw Ronald Knight smoking marijuana while on-the-clock or at a GTI job site." (Doc. 25-9 at 3, ¶10).

---

[10] There has been no objection to the admissibility of this statement.

Tommy Payton stated in his declaration:

Because I supervise GTI's Tower Crew, I only worked with Ronald Knight on a few occasions. On several occasions, however, I heard other GTI employees including Scyler Stephenson and Len Bracken complain that Ronald Knight's work performance was poor and that they did not want to work with Ronald Knight moving forward because Mr. Knight failed and/or refused to perform assigned work tasks on job sites.

(Doc. 25-12 at 2, ¶7).[11]

Brandon Reno stated:

During my employment with General Telecom, I worked with Ronald Knight on a daily basis during May and June 2015. During the [time] I worked with Ronald Knight at [job sites], he displayed extremely slow and poor work performance. For example, while performing a generator installation, Mr. Knight worked in the air conditioned shelter at the job site while the rest of the crew worked in the sun. On that day, Mr. Knight took approximately six hours to complete what is generally two hours of electrical work on the generator.

[] At the end of a day's work, the crew working with Ronald Knight would check his work to ensure that he actually completed whatever tasks he said he was working on during the day and that his work met GTI and customer's standards. The crew at times found Mr. Knight's work tasks were not completed or did not meet standards and thus had to complete the tasks for him or redo his work.

(Doc. 25-10 at 2, ¶¶6-7). Reno also stated that:

When I began my employment at GTI, I was assigned to perform preventative maintenance work on generators with Ronald Knight. Mr. Knight was expected to train me regarding preventative maintenance on generators. As part of the job, Mr. Knight and I were required to change

---

[11] There has been no objection to the admissibility this statement.

the oil in generators that had over 50 hours. Mr. Knight, however, instructed me to not change the oil in the generators and to falsify the job completion paperwork. In addition, the work required certain testing of generators and paperwork certifying the completion of the testing. Mr. Knight told me to simply complete the paperwork stating that testing on the generators had been completed even though it had not been completed. I refused to falsify the paperwork and reported Mr. Knight's conduct to GTI management.

(Doc. 25-10 at 2, ¶5).

### 3. *Knight's Insubordination*

Chamoun explained that Knight was frequently insubordinate and disrespectful to him. The following exchange took place in his deposition:

A.     . . . He insulted me and offended me.

Q.     How did he do that?

A.     "Fucking no." These were his words. The "fucking," aggressive, violent, verbal abuse was his constant response to my -- to my communications with him.

Q.     When did he do that?

A.     On several, several occasions.

Q.     Are they noted [in writing]?

A.     . . . [T]he "Fucking no" and "Fucking yes" and "I'll fucking" this -- excuse my language -- were not recorded maybe in some of these documents because I feel insulted that these words were directed toward me.

Q.     When you were telling him what to do?

A.     No, sir. When I told him what not to do.

Q.     Okay. Well, when you gave him instruction, whether to do it or not do it, he used the curse words toward you?

A.     Not curse words. Insulting, violent, abusive language, yes.

Q.     When he said "Fucking no," that was his response to you giving him instructions?

A.     It was more than that, sir.

Q.     Okay. He was aggressive, is what you're --

A.     Yes. His eyes would bulge out, his face will turn red, and he will say, "Nobody will fucking tell me where to smoke and where not to smoke." That was an example, one example of that.

(Doc. 25-4 at 10(35-36)).

However, Chamoun admits that the Plaintiff was not fired for acts of insubordination. In his deposition, the following exchange took place:

Q.     So, why didn't you just fire him for one of those two times when he was being insubordinate to you?

A.     . . . Thank you for this question. It's an excellent question that I ask myself that every day, every hour of the day and the night.

Q.     Well, then you must have a really good answer.

A.     No. It's stupidity on my part.

Q.     Okay.

> A.      It's a mistake on my part. And it's out of the goodness of my heart
> and love and respect for Mr. Knight.

(Doc. 25-4 at 12(41)).

### C.      Knight's First "Termination" and Subsequent Probation

In March 2014, Chamoun decided to terminate Knight after Knight tested positive for illegal drugs (marijuana). (Doc. 25-1 at 3, ¶10.a.). After Knight was notified of his termination, Knight "begged and pleaded" to stay. (Doc. 25-1 at 3, ¶10.a.). Chamoun agreed to let Knight stay employed, on probationary status, on the condition that any future policy or procedure violations or performance issues would result in his immediate discharge. (Doc. 25-1 at 3, ¶10.a.).[12] Knight admitted in his deposition that he continued to smoke marijuana "at his house" after the failed drug test and while he was still employed by GTI. (Doc. 25-2 at 32(121-122)). Chamoun understood that Knight had stopped using marijuana as part of his continued employment.

### D.      The "Fiber Optic Pedestal" Incident

In his declaration, Bracken describes the following incident:

---

[12] In his deposition, Chamoun stated: "I told him, 'You will be rehired under two conditions: one, to seek help and treatment for your addiction; and two, you will be on probation for the rest of your employment at General Telecom, Inc. and that one more mess-up of any kind will result in your termination.'" (Doc. 25-4 at 9(29-30)). Knight admitted in his deposition that he failed the drug test and that he asked Chamoun to let him stay. (Doc. 25-2 at 30(116)-31(117)).

On or about February 19, 2015, I was assigned to work with Ron Knight on a job site in Springville, Alabama on Simmons Mountain for T-Mobile. On that day, Knight and I were assigned to dig an approximate 60 foot ditch by hand because heavy machinery was prohibited in the area. Knight became very upset at the prospect of digging the ditch as required by hand. Knight told me that he refused to help dig the ditch by hand and sat in the truck while I began digging. After I had dug approximately 20 feet of the ditch, Knight got out of the truck and grabbed a pick axe. Knight began wielding the axe around wildly and violently. I was afraid for my personal safety and I personally observed Knight intentionally damage a fiber optic pedestal with the axe, which I understand GTI later had to pay to have fixed and/or replaced. As a result, I reported Knight's behavior to Jeff Bowerman that afternoon. I further notified GTI management that I could not work [with] Knight in the future because of his violent behavior and overall poor work ethic. After Knight broke the pedestal, he took a break from the job and I dug almost the entire ditch myself while Knight watched me over an approximately six hour period. I did not continue to work on projects with Mr. Knight after this incident.

(Doc. 25-6 at 3, ¶9).[13] Mr. Knight claims that he damaged the pedestal "accidentally."

(Doc. 25-2 at 36(137)). In his deposition he stated: "I was using a pickaxe. And, like

---

[13] The Plaintiff disputes Bracken's account as conflicting with Bracken's handwritten statement regarding this incident. The Plaintiff writes:

> the handwritten statement says nothing about Plaintiff swinging the axe in a "violent and aggressive manner" or "swinging an axe wildly in anger" but rather states that he was using a pickaxe "to break ground loose," consistent with digging a ditch, and that in the course of this work he "broke the base of the fiber optic pedestal."

(Doc. 33 at 5, ¶22) (citing doc. 25-1 at 65). In fact, the statement to which the Plaintiff refers consists of <u>two</u> pages (the Plaintiff cited only the second). (*See* doc. 25-1 at 64-65). When the <u>complete</u> statement is reviewed, it actually states that Knight was "swing[ing] wildly in a [tirade] [manner] and broke the base of the fiber optic pedestal." (Doc. 25-1 at 64). Bracken also states: "I request from my supervisor that I wasn't able to continue working with Ron that I needed another person to work with who was ethically performing his work." (Doc. 25-1 at 65).

I said, it was froze [sic] like that (indicating). It was solid ice. Pick was bouncing off of it. I just accidentally hit it." (Doc. 25-2 at 36(137)).[14]

When asked in his deposition if there was "a reason you didn't fire him for that?" Chamoun testified: "[m]y stupidity, my mistake, and my good heart." (Doc. 25-4 at 13(47)). The following exchange also took place:

Q. And the reason you didn't fire him for that is the same? Correct?

A. I should have fired him ten times already, but I didn't, yes.

(Doc. 25-4 at 12(48)).[15]

### E. The Fainting Incident

It is undisputed that, on June 9, 2015, the Plaintiff passed out, on a job site, as a result of his blood sugar getting too low. (Doc. 25-2 at 41(159), 42(163)-43(165)). The Plaintiff and the rest of his crew had stayed at a hotel the night before. For

---

[14] The Defendant proffers the following fact:

> During 2015, some of Knight's coworkers notified GTI management that they refused to work on projects with Knight because of Knight's work habits and fear of Knight's violent and aggressive behavior.

(Doc. 24 at 9, ¶9.c.) (and citations thereto). The citations provided by the Defendant in support of this fact establish only that <u>Bracken</u> made such a request. (*See* doc. 25-6 at 3, ¶9).

[15] The Defendant states that "GTI learning of Knight destroying customer property from an employee who no longer wanted to work with Knight was a factor in the discharge decision." (Doc. 37 at 2) (citing doc. 25-1 ¶13.c. and doc. 25-6 ¶9). Both citations given by the Defendant are merely different persons recounting <u>that the fiber optic pedestal event occurred.</u> Neither citation provides evidence that that event <u>was a factor in the decision to fire the Plaintiff.</u>

breakfast the Plaintiff had only a muffin at the hotel. Because he understood from Chris Howard that the job would last only a couple of hours, the Plaintiff had only a pack of crackers in his lunch box, which he ate early in the day at around 10:00 am.

The job took longer than expected however, and, around noon, the Plaintiff began feeling ill, and told the others he needed to eat. Knight testified that "when I start to feel really bad when my diabetes really acts up, the sunlight just is a big glare and I can't -- I can't see. So I went into the shelter and I sat down, and next thing I know Chris Howard was picking me up off the floor." (Doc. 25-2 at 43(165)). This was around 3:00 pm. (Doc. 25-2 at 43(165)). The Plaintiff told Chris Howard that he needed food, and Howard sent another employee down the road to Jack's. Within an hour, Knight felt better.

Howard called Bowerman, and Bowerman told Howard to bring Knight to the shop. (Doc. 25-3 at 13(45); doc. 25-7 at 3, ¶10; doc. 25-2 at 43(166)).[16] Chamoun

---

[16] This disputed fact is cast in the light most favorable to the Plaintiff. Bowerman testified that he first told Howard to take Knight to the hospital, but that Knight refused to go. (Doc. 25-3 at 13(45); *see also* doc. 25-7 at 3, ¶10 (Bowerman Declaration)). Howard stated the following in his declaration:

> I . . . called Jeff Bowerman . . . and told him it appears like Mr. Knight has "passed out[.]" At that time, Mr. Knight sat straight up and stated: "I am alright. I just need to eat." During the telephone call, Mr. Bowerman instructed me to take Mr. Knight to the nearest hospital so that he could receive medical treatment. Mr. Knight, however, stated that he was "not going to the fucking hospital[.]"[] Mr. Bowerman then instructed me to bring him to GTI's office in Bessemer, Alabama. I told Mr. Bowerman that I would bring Mr. Knight to GTI as soon as I finished my safety paperwork at the job site.

testified:

> After his incident, Mr. Knight came to my office. And as soon as I saw him, I said, "Ron, you need to get medical" -- "to be checked out and get a drug test." And he said: "No, I don't want to do that today. Fucking no." And he walked away.

(Doc. 25-4 at 20(75)). Bowerman testified that he saw Knight at the shop too and told

Knight that he needed to go to the hospital, but that Knight refused and did not say

why. (Doc. 25-3 at 13(47)). In his declaration, Bowerman states:

> When Mr. Howard and Mr. Knight arrived at GTI, I instructed Mr. Knight that GTI needed to take him to the hospital for treatment and a post-incident drug test. Mr. Knight, however, told me that he was not going to see GTI's doctor and would make an appointment with his own personal doctor at his convenience. I told Mr. Knight a drug test was required by GTI policy. Mr. Knight then got in his vehicle and left the premises.

(Doc. 25-7 at 3, ¶10).

The following exchange took place in the Plaintiff's deposition:

Q.      . . . And did you ride back to the shop in Bessemer with Chris

---

> While I completed my safety paperwork, I instructed Brandon Reno to go to Jack's and pick up lunch. After I finished my safety paperwork at the job site and Mr. Knight ate his lunch, as instructed I drove Mr. Knight in my truck to GTI's office. During the ride back to GTI, Mr. Knight told me that he could not go to the hospital because he could not "pass a piss test[.]"[]

(Doc. 25-8 at 3, ¶11). The Plaintiff testified that Bowerman said to "bring me back to the shop," and that no one told him to go to the hospital. (Doc. 25-2 at 43(166-167)). When asked in his deposition whether he remembered telling anyone that he would have failed a drug test if taken that day, the Plaintiff answered "No." (Doc. 25-2 at 44(169)).

Howard?

A.      Yes.

Q.      When you arrived at the shop, what did you do?

A.      Got my tools out of Chris'[s] truck and put them in my truck. I think I talked to [Dr.] Lee [Chamoun], I'm not sure, about Lee said I needed to go see a doctor and get it -- and get a drug test.

Q.      But you didn't go on that day, did you?

A.      No. It was late when we got back. I explained to Lee that it was my diabetes is why I passed out. And once I got something to eat, I was fine. But he still wanted me to go see a doctor and get a drug test. So I went the very next morning.

(Doc. 25-2 at 43(168)-44(169)). Knight admitted in his deposition that he knew that after any type of work-related accident or injury he would be required to take a drug test immediately. (Doc. 25-2 at 32(123)).

It is undisputed that, after Knight left, Chamoun sent him a text message asking him to "[p]lease seek medical treatment and also please get a drug test done today or tomorrow at the latest. We need these tests after every incident for ins [sic] requirement." (Doc. 34-2 at 4). Although Chamoun testified that "[w]e have a specified doctor that he's been to twice when he was injured on the job, and he went to our company-designated doctor and -- that everyone goes to" (doc. 25-4 at 20(76)), Chamoun admitted that at no time did he ever tell Knight specifically to go to this

doctor (doc. 25-4 at 21(77)). Chamoun explained that the requirement to go to this

doctor

> was common knowledge and . . . he has been to that same doctor twice.
> You just assume this is our doctor, that's where you go. Unless he
> wanted to go to an emergency room, which we wanted him to as soon as
> the incident happened, to go to an emergency room. When he refused
> and showed up at the office, then I told him go to the doctor if not go to
> an emergency room.

(Doc. 25-4 at 21(77)).

> The next day Knight took a five panel drug test and the results were negative.

(Doc. 25-2 at 46(179-180), 115). When confronted with these test results in his

deposition, Chamoun testified:

> A.      The drug test that we require people to seek is our designated drug
> testing center and workmen's comp physician. And this was not
> performed at that center. The drug test we perform is a ten-panel drug
> test. If I remember, this is a five-panel drug test. And comment that Mr.
> Knight made to people the day before he took this drug test, or two or
> three days before he did it, he "will not go to no fucking hospital," and
> if his drug test -- and if he does take a drug test, it will be positive. He
> wants to go to a doctor's office where his drug test will be negative.

> Q.      Did you hear him say that?

> A.      No, sir.

(Doc. 25-4 at 14(50-51)).

### F.    **Employee Warning Notices**

The record contains seven written "Employee Warning Notices" which were completed by Chamoun and which report conduct allegedly engaged in by Knight. (Doc. 25-4 at 39-45). The purpose of these "warnings" is unclear since, even though there is a place for doing so on each form, none of the forms is signed by the Plaintiff, and Chamoun admits that he never showed any of the forms to the Plaintiff.[17] Chamoun stated that he "told them to him verbally" (doc. 25-4 at 10(33))[18] since the Plaintiff could not read. Although it is unclear from the record the date each of these notices were created, Chamoun testified that "these were things I witnessed specifically on these dates." (Doc. 25-4 at 13(48)). Again, Knight testified that no rules violations were ever discussed with him. (Doc. 25-2 at 34(129)).

#### 1.    *December 12, 2014*

On this warning, Chamoun has written:

I saw Ronnie Knight smoking at GTI as he was talking to James Stephenson. When I approached them, Ronnie threw down his cigarette as he cursed me. I told him that smoking is not allowed at GTI. And to please remember that. He walked away. So I asked James Stephenson

---

[17] As to one of the notices (the one concerning the incident where the Plaintiff passed out), Chamoun testified that it was created merely to document the incident. (Doc. 25-4 at 19(71)-20(73)).

[18] When asked why he didn't read the warning forms (verbatim) to the Plaintiff, Lee Chamoun testified, "Oh, he would have stabbed me with a knife ... He would have stabbed me or killed me or insulted me." (Doc. 25-4 at 10(33)-(35)).

what was Ronnie talking to him about and James said, ["]Oh he just wanted to talk about shit and stuff.["]

(Doc. 25-4 at 39). The applicable "Violation" marked was "Conduct." The Plaintiff disputes that this conversation took place. (Doc. 25-2 at 34(131)). Referring to this warning, the following exchange took place in Knight's deposition:

> Q.      It refers to you smoking on General Telecom's premises and that Dr. Chamoun told you that smoking was prohibited.
>
> A.      No.
>
> Q.      Do you remember that discussion in December 2014?
>
> A.      No.

(Doc. 25-2 at 34(131); *see also* doc. 25-2 at 100 (December 12, 2014, warning notice).[19] Regardless, it is undisputed that Knight repeatedly broke the smoking rule.[20]

---

[19] Thereafter, the following exchange took place:

Q.      . . . you are disputing that a verbal discussion was had with you?

A.      I don't remember one.

Q.      All right. And when you say I don't remember, does that mean it might have happened and you just don't remember as you sit here today?

A.      I don't remember ever having a discussion about smoking.

(Doc. 25-2 at 34(131)).

[20] As noted previously, Knight denies ever being counseled on rules violations. However, the following facts were proffered by the Defendant and not disputed by the Plaintiff:

[10.b.] (3) . . . (a) Whether or not he felt others sometimes broke the rule, Knight

## 2. *January 15, 2015*

On this warning, Chamoun has written: "Ron has not been to work for 4 days and has not presented to us a vacation or time off request as per GTI policy." (Doc. 25-4 at 40). The applicable "Violation" marked was "Attendance." Chamoun confirmed that this write up was not created on January 15, 2015. (Doc. 25-4 at 13(45)). Knight states that the facts stated in this warning are not true and that he "wouldn't be a no show person." (Doc. 25-2 at 35(133)).

---

alone was repeatedly observed ignoring GTI's rule against smoking in areas where explosive chemicals are present even after being instructed to stop.

> 1-Safety and customer relations reasons support the rule and photographs reflect in these areas signs clearly forbidding smoking Dr. Chamoun had reason to believe Knight would see.

> 2-Dr. Chamoun repeatedly brought this issue to the attention of Knight and his supervisor.

> 3-Dr. Chamoun observed and received reports that Knight was ignoring his instruction throughout this period.

(Doc. 24 at 11-12). The Plaintiff only responds to these facts with: "Lee Chamoun admits that the Plaintiff was not fired for smoking, for being insubordinate by smoking after being told not to, nor for allegedly cursing when he was told not to smoke." (Doc. 33 at 6). Since, to the Court's knowledge, except for the part about Knight being counseled, these facts have not been disputed in the record, they are deemed to be admitted for the purpose of liability on the discrimination claim only. As noted in this Court's discussion regarding the COBRA claim, in light of the difference in the arguments made by the Defendant, and the way in which the Defendant presented its facts, the Court gives the Plaintiff the benefit of the doubt and assumes that his response to these facts was not crafted with the COBRA claim in mind, and therefore will not deem those facts to be admitted as to that claim.

### 3.    *February 19, 2015*

On this warning, Chamoun has written:

Ronald Knight was working with Lynn Bracken at a Springville job site today. Ron refused to work, complained and cursed GTI and while Lynn was digging the ditch of 55', Ron was calling and getting mad and sitting in his truck on the phone making phone calls. He finally got an axe and went into a tirade and started swinging the axe. Lynn was afraid for his safety. Ron swinging at the fiber optic pedestal and broke it. GTI now [has] to send a crew to repair the damage that was negligently caused by Ron.

(Doc. 25-4 at 41). The applicable "Violations" marked were "Carelessness," "Gross Mis-conduct," "Insubordination," "Personal Work," "Safety," and "Willful Damage to Company Property." As noted previously, the Plaintiff admits that he damaged the pedestal, but that it was an "accident." (Doc. 25-2 at 36(137)).

### 4.    *February 20, 2015*

On this warning, Chamoun has written:

After damaging the fiber optic pedestal[;] [a]fter cursing and complaining all day[;] [a]fter swinging an [a]xe in a tirade[;] [a]fter refusing to work[;] [a]fter negligently [d]amaging customer property[;] Ron did not show up to work today.

(Doc. 25-4 at 42). The applicable "Violations" marked were "Attendance," and "Unauthorized Absence." The Plaintiff states that he remembers showing up for work on that day. (Doc. 25-2 at 37(141)).

### 5. *April 13, 2015*

On this warning, Chamoun has written:

I observed Ron smoking inside the warehouse building as he stood right next to gasoline red gallons, spray cans, solvents, paints, [and] compressed gases containers. A sign of [sic] non smoking was facing him on the shelf. I approached him in a hurry and asked not to smoke and that it is dangerous to smoke here. He turned his back to me, smoked more, and mumbled ["]no one can tell me whether I can smoke or not.["] He walked slowly as he smoked towards the exit door. GTI does not allow smoking outdoors as well due to gasoline storage tanks.

(Doc. 25-4 at 43; *see also* doc. 25-4 at 11(37-38) (reading the contents of the warning)).[21] The applicable "Violations" marked were "Gross Misconduct," and "Gross Insubordination." In his deposition, Chamoun testified that on this occasion Knight also cursed at him, using the word "fucking." (Doc. 25-4 at 11(39)). Knight states that he does not remember the conversation referenced in this warning. (Doc. 25-2 at 37(143)). Further, as noted above, it is undisputed that Knight repeatedly broke the smoking rule by smoking around dangerous chemicals.

### 6. *June 8, 2015*

On this warning, Chamoun has written:

Ronald was smoking inside adjacent to flammables and gasoline tanks and by the sign that said ["]no smoking.["] He looked at me with anger,

___

[21] As they are handwritten, it is very difficult to make out all of the contents of each warning. Thus, the Court has combined the warning itself and the deposition testimony of Chamoun, where he read the warning aloud.

turned his back and kept smoking. I said ["]Ron please you cannot smoke at GTI and it is not safe man, it's really dangerous to [sic].["] He walked away; stayed in the warehouse and kept smoking indoors where it is dangerous and prohibited due to safety. I walked up to Jeffrey Bowerman and said ["]Jeff please tell Ron he cannot smoke in here, it's not safe and this is not the first time he [has done] it.["] Tell him I am serious and that [this is] his 3rd warning that I am going to write up.

(Doc. 25-4 at 44; *see also* doc. 25-4 at 11(39-40) (reading the contents of the warning)). No applicable "Violations" were marked, although the word "gross" has been handwritten in twice over the both words "Conduct," and "Insubordination." Chamoun testified that on this occasion as well Knight cursed at him, although it is not documented. (Doc. 25-4 at 11(40)).[22] Knight does not remember the conversation referenced in this writeup. (Doc. 25-2 at 37(144)-38(145)). Again, however, it is undisputed that Knight repeatedly broke the smoking rule.

### 7. *June 9, 2015*

On this warning, Chamoun has written:

---

[22] The following exchange took place during Chamoun's deposition:

Q.      Is that everything that was said on that occasion? Or did he use the curse words then?

A.      He always used the curse word, even when I -- at this occasion, I'm sure he did, but I did not document it.

Q.      Told you "Fucking no" and things like that?

A.      Yes.

(Doc. 25-4 at 11(40)).

> Chris Howard called us today and said that Ronald Knight has passed
> out inside the cell tower shelter as he was sitting down on the floor of
> the shelter while smoking a cigarette inside. Smoking inside the shelter
> is prohibited by the customer.

(Doc. 25-4 at 45). Under "Action Taken" appears the following language: "Informed Chris to take Mr. Knight to the nearest hospital E.R. for treatment and for [drug testing] as required by our Insurance." (Doc. 25-4 at 45; *see also* doc. 25-4 at 12 (reading the contents of the warning)). The applicable "Violations" marked were "Gross Misconduct," and "Gross Insubordination." Chamoun testified that he did not go over this warning, even verbally, with Knight. (Doc. 25-4 at 20(73)-(74)).

## G.    The Downturn in GTI's Business[23]

Until the fall of 2014, GTI worked on projects using crews of as few as one and as many as five employees on a site. For a large part of the time during which the Plaintiff was employed as a helper, GTI installed and maintained generators at customer sites, but that work (which often required a helper) largely dried up after the completion of the General Dynamics contract ending June 12, 2015. Furthermore, in 2014 and thereafter, GTI's customers were facing changes in the industry relating to charges for data and other services, and began insisting that GTI perform services

---

[23] All of the facts in this section are either admitted by the Plaintiff, or deemed to be admitted by the Court. Some of these facts were proffered by the Defendant in document 24 at pages 4-5, ¶¶1.a.-1c., 2.d.). All of those facts were admitted by the Plaintiff. (*See* doc. 33, no dispute). Many of the facts were proffered by the Defendant in document 24 at pages 9-11, ¶10.b.(1)-(2). In his brief, the Plaintiff has not disputed these facts. Instead he addresses these facts together saying:

> A reasonable jury could find that the "reduction in force" was pretext because Plaintiff's termination occurred almost immediately after Lee Chamoun learned that Plaintiff was diabetic and that he had experienced a syncope at work; he was the only Alabama employee laid off, and Defendant then rehired Mike Jones.

(Doc. 33 at 5-6). The court's Uniform Initial Order, entered in this case on April 14, 2016, states:

> Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

(Doc. 11 at 17) (italics in original). Not only does the Plaintiff's response not "dispute" anything, it cites to no portion of the record in support of his statement. His response is "argument," inappropriate for this portion of his brief. Accordingly, the Court has deemed these facts to be admitted, and included them verbatim.

with crews of one, except when the services require a certified tower climber to climb, and where the law called for more than one. Only individuals with climbing certifications perform work climbing cell phone towers to install or maintain equipment, and only those able to operate the truck GPS can serve on one-person crews. Knight could not operate the GPS necessary to enable him to find the customers' remote locations and he lacked certifications necessary to do tower climbs, and knowledge and skills for other available work. In other words, Knight lacked skills necessary for work available following changes in the telecommunications industry <u>and</u> loss of work with customer General Dynamics beginning on June 13, 2015. Accordingly, Knight was discharged as part of a reduction in force during the third week of June 2015.[24]

## H.    Knight's Termination

After the incident where the Plaintiff passed out, Knight returned to work on June 10, 2015, and worked June 11 through June 13, and June 15 through June 19, 2015. On the evening of Saturday, June 21, 2015, twelve days after passing out from the episode on June 9, the Plaintiff received a text from Jeff Bowerman telling him "Stay home tomorrow it's going to be [too] hot for you to work." (Doc. 25-3 at 31).

---

[24] Knight admits he had no knowledge respecting GTI's future work or contracts at the time of his discharge.

Plaintiff responded, "I will be fine tomorrow I will see you at 6." (Doc. 25-3 at 31).

Bowerman replied, "I can't let u work." (Doc. 25-3 at 31). Plaintiff asked, "Why[,]

I've been working in the heat," and Bowerman replied, "You will have to talk to Lee

[Chamoun]." (Doc. 25-3 at 31). In Bowerman's deposition, the following exchange

took place:

> Q.    Why did you tell him, "You need to stay out of the heat"?
>
> A.    Because heat will make you sick if you're -- I don't know.
>
> Q.    Will make you sick if you're diabetic?
>
> A.    Will make you sick if you're in it for a long period of time.

(Doc. 25-3 at 14(50)). It is undisputed that Bowerman had been told by Chamoun to

tell Plaintiff he should not work because it was too hot. Chamoun testified that he had

Bowerman tell Plaintiff to stay home and rest because the last time he talked to him,

the Plaintiff said "I'm fucking tired. I'm too fucking tired." (Doc. 25-4 at 31(117)).[25]

---

[25] Chamoun stated:

> The decision to terminate Mr. Knight has been going as a long-term process. And
> I was preparing to make that decision. And that was why I asked him to stay
> [home], because of the heat. In addition to that, Mr. Knight, last time I saw him, I
> said, "How are you, Ron?" He said: "I'm fucking tired. I'm too fucking tired." So
> we told him to stay home so he can get some rest. But I'd already made the
> decision to terminate him, as a part of a continuous process. Chamoun testified,
> "[a]fter we begged him, several of us, to go to the hospital to seek treatment and
> he did not, we just given up on Mr. Knight."

(Doc. 25-4 at 30(116)-31(117)).

The Plaintiff testified that he never told Chamoun he was tired. (Doc. 25-2 at 49(191)).

Nevertheless, Knight returned to GTI the next morning, July 22, 2015, to work. That day, the Plaintiff spoke to Chamoun, who told him "work was slow," that they had laid someone else off in Mississippi, and that Plaintiff should "go home and rest" and Chamoun would call him. (Doc. 25-2 at 49 (191)). Chamoun stated the following in his deposition:

> I wanted to tell him that he was terminated, but I was afraid of him, he's already used aggressive, violent, abusive language with me. So I told him, "You're tired, please go home and get some rest." I was afraid of telling him that he's being laid off at that point.

(Doc. 25-4 at 31(119)).

The Plaintiff eventually found out that he had been terminated when he called Chamoun on June 24, 2015, and Chamoun told him that he was being terminated for "inefficiency." (Doc. 25-2 at 49(192)).[26] Chamoun testified that it "was a lengthy process" (doc. 25-4 at 18(68)) which culminated in Knight's termination

> [a]fter extreme deliberation on my part and evaluating Mr. Knight's incompetence, Mr. Knight's gross misconduct, and after our lack -- occurrence of lack of work, and after Mr. Knight has violated

---

[26] The Plaintiff used the word "insufficiency" in his deposition, which the court has corrected to "inefficiency." Chamoun states that he told the Plaintiff he was being "laid off" "[d]ue to the lack of work, his inefficiency, his gross misconduct, and his violation of his probation time." (Doc. 25-4 at 32(121)).

repetitively the terms of his probation from 2014, the termination and rehiring.

(Doc. 25-4 at 19(69)).

It is <u>undisputed</u> that "[n]o medical condition—known or unknown—played any role in the decision to discharge Knight." (Doc. 24 at 14, ¶11 (proffered by Defendant and not disputed by Plaintiff). Chamoun, Bowerman, and other company employees are diabetics. Knight told Chamoun that he too was a diabetic and that he (Knight) believed his diabetes caused him to faint. No one told Knight he was discharged because of his diabetes. No one told Knight anything leading him to conclude he was discharged because he had diabetes. Knight knows of no similarly situated employees, who engaged in the same alleged conduct as he, who were retained in the employment of GTI. Knight has no other facts supporting the conclusion he was discharged because of diabetes.[27]

## I.   <u>Knight's Unemployment Claim</u>

The Defendant did not fight the Plaintiff's unemployment claim. Chamoun stated that the company generally does not fight unemployment claims "[u]nless it was something that we believe that the -- it was intentional or involves -- it involves

---

[27] This last fact was proffered by the Defendant. In response, the Plaintiff states: "Plaintiff's attorneys, not Plaintiff are responsible for marshaling the facts." (Doc. 33 at 8). One wonders for what opportunity Plaintiff's counsel is waiting to begin "marshaling", if not in response to this proffer? Counsel's failure to dispute this proffered fact at all, much less with citations to the record, has resulted in the Court deeming this fact to be admitted.

fraud." (Doc. 25-4 at 26(99)). The only reason Chamoun gave to the Alabama Department of Labor for the Plaintiff's discharge was "lack of work." (Doc. 25-4 at 32(122-123)).

## J.      Others Who Were Laid Off/Rehired

About the same time that the Plaintiff was laid off, the Defendant also laid off Dyrk Trosclair in Mississippi, and Johnny Wills in Alabama. (Doc. 25-1 at 5, ¶11.e.). Defendant hired two employees/independent contractors after it terminated the Plaintiff. One employee, Jason Thompson, "was hired as a tower climber to climb and perform work on telecommunications and satellite towers, which Mr. Knight was not certified to perform." (Doc. 25-7 at 3, ¶15). The company also re-hired Mike Jones, whom Bowerman stated could perform technical electrical tasks such as integration and fiber optic work on telecommunications sites–also tasks Knight could not do. (Doc. 25-7 at 2, ¶6).[28] Jones worked on various crews doing various tasks, including installing equipment such as batteries and power plants. Chamoun testified that Mike Jones "is multitasked, like everybody else at the company" and also performed non-skilled labor such as "bathroom receptacle, cleaned warehouse, technician, LTE." (Doc. 25-4 at 27(102)).

---

[28] Chamoun testified that Jones quit shortly after Chamoun contacted him about another employee, with whom he worked, allegedly stealing from the company. (Doc. 25-4 at 25(93)).

It is undisputed that the Defendant did not terminate Jason Thompson or Stephan Glass despite a physical altercation in which both of them were engaged at work. (Doc. 25-4 at 23(85-88); doc. 25-4 at 49).

## K. Knight's Post-Termination Threats Against Other Employees

On August 3, 2015, Mike Jones informed Chamoun that Knight had called him (Jones) and "threatened [him] with bodily harm if [he] [made] a statement as to [Knight's] perform[ance] at GTI." (Doc. 25-1 at 77).[29] Chamoun reported to the Bessemer police that Knight had "threatened at least two of our employees." (Doc. 25-1 at 79).[30]

---

[29] Chamoun's affidavit refers to "threats" plural. The Court has examined the statements he cites, and only sees a threat against Jones, which is documented twice. (*See* doc. 25-1 at 74 ("I would regret not helping him"), and 77 ("threatened me with bodily harm"). The Plaintiff states that he "never made such threats," but the evidence he cites to references only a portion of his deposition where he denies making a threat against Howard, not Jones. (*See* doc. 33 at 7, ¶45).

[30] The Defendant proffers the following fact: "Knight lost his subsequent employment at Camping World for similar such behavior." (Doc. 24 at 13,-14, ¶10.c.(1)(b)). This fact is **STRICKEN** since it, and the evidence cited in support thereof, is inadmissible character and/or "other acts" evidence. *See* FED. R. EVID. 404(a)(1), (b)(1).

## L.    Alleged Denial of Accommodations[31]

Knight testified that he has not any issues before June 9, 2015, performing the duties of his job because of his diabetes. (Doc. 25-2 at 41(158)). He also stated that there were no jobs he could not perform because of his diabetes, and he did not need any type of help or assistance to perform his job. (Doc. 25-2 at 41(158)). Prior to June 10, 2015, Knight never requested any type of accommodation. (Doc. 25-2 at 46(177-178)).[32] At that time he presented a doctor's note to Chamoun which stated that the Plaintiff needed "regular breaks for rest and meals." (Doc. 25-2 at 45(174); doc. 25-2

---

[31] The facts in this section are almost entirely proffered by the Defendant. (*See*, doc. 24 at 15-16, ¶¶12.a.-12.d. and citations therein). The Plaintiff does not address each fact separately. Instead, he responds to all of these facts with the following:

> Disputed, as Plaintiff testified, "people that I've worked with know that I'm a diabetic. And when I told them that I feel bad, I need to eat, that -- they told me that the job's almost done, wait, wait, wait, where they waited too late and I passed out." (Doc. 25-2, 152:1-6). A reasonable jury could find that Plaintiff was terminated to avoid accommodating his need for breaks for his diabetes going forward.

(Doc. 33 at 7). This single statement and citation to the record does not sufficiently dispute all of the facts or evidence cited by the Defendant.

[32] Bowerman stated that he never spoke to Knight about his need for breaks. (Doc. 25-3 at 25(94)). In Chamoun's affidavit, he states that:

> I received after June 10, 2015 a list of restrictions from his physician, but not a medical record stating why they were imposed; I honored the restrictions (I had never received any before or since and never got anything from a doctor that stated he had diabetes until after his termination).

(Doc. 25-1 at 6, ¶14.c.).

at 114). When asked about this in his deposition, Knight agreed that he had always been permitted to take sufficient breaks, even before that request, stating that he "took breaks as [he] needed them." (Doc. 25-2 at 46(177)).

The following exchange took place during Bowerman's deposition:

Q.     Did anybody let you know that he needed -- that Mr. Knight needed to take regular breaks?

A.     Dr. Lee [Chamoun] did tell me that Ron Knight needed to take extra breaks.

Q.     Did he take extra breaks?

A.     He, from my observing him, yes, he took many breaks.

Q.     Extra breaks?

A.     Extra breaks.

(Doc. 25-3 at 25(94)). The Plaintiff testified that Chamoun told him after he passed out that he could not take a break. (Doc. 25-2 at 22(84)). No one else ever told him that he could not take a break. (Doc. 25-2 at 23(85)). He was never prohibited from taking a break. (Doc. 25-2 at 28(105)). However, Knight testified:

Because I've -- people that I've worked with know that I'm a diabetic. And when I told them that I feel bad, I need to eat, that -- they told me that the job's almost done, wait, wait, wait, where they waited too late and I passed out. Chris Howard knows I'm a diabetic. You know, Mike Jones, everybody I've ever worked with. Scieler knew I was diabetic. When I told him I had to eat, Scieler would always say okay, let's go eat, you need something.

40

(Doc. 25-2 at 39(152)).

Chamoun testified in his deposition that at the time the Plaintiff passed out Chamoun did not know that the Plaintiff was a diabetic. (Doc. 25-4 at 12(43)). At first, Chamoun testified that he only learned of the Plaintiff's condition when the Plaintiff filed his EEOC charge alleging disability discrimination. (Doc. 25-4 at 12(43)). Later, Chamoun admitted to having received a text message from the Plaintiff on June 9, 2015 which stated "I got sick because of my diabetes." (Doc. 25-4 at 16(57)). Chamoun testified that before that text he had never been informed, in any way, that the Plaintiff had diabetes. (Doc. 25-4 at 18(67)). The Plaintiff states that he informed the Defendant of his diagnosis "years before [his] employment ended," because he informed it right after he was diagnosed. (Doc. 25-2 at 40(156)).

### M.    COBRA

Chamoun states in his affidavit that he:

> provided a blanket notice . . . that included COBRA information and also notified the reader how to obtain additional information; I had used this notice in the past without incident with employees, and employees who had elected COBRA coverage in response.

(Doc. 25-1 at 7, ¶16.b.; doc. 25-1 at 83). A handwritten note appears in the record which reads:

> On Thursday, July 30th 2015[,] around 3 PM, Ron Knight[']s wife Kim came by and picked up his last paycheck. Dr. Lee Chamoun and I gave

Kim a release form to read and sign. She read it and said she did not want to sign it. We gave her the check and she left.

(Doc. 25-4 at 37). The note appears to be signed by Janis Rosser. (Doc. 25-4 at 37). In her declaration, Rosser confirmed these events and added that she gave the form to Mrs. Knight to "have him sign and return it to GTI." (Doc. 25-11 at 2, ¶8). She states that Mrs. Knight "stated that she would ask Mr. Knight to sign [the form] and took it . . . when she left the premises." (Doc. 25-11 at 2, ¶8). The "release" to which the note refers appears at least 4 times in the record as documents 25-1 at 83, 25-2 at 172, 25-4 at 38, and 25-11 at 6. Chamoun also testified that Mrs. Knight took the document with her. (Doc. 25-4 at 7(22)). Mr. Knight testified in his deposition that he never received the document, and that his wife did not receive it. (Doc. 25-2 at 51(197-198)).

On June 26, 2015, Chamoun received an email from Kerri Edwards at Blue Cross/Blue Shield which stated: "Based on the group size–COBRA is not available to this group. If the group is larger than 20 employees, please send me a letter so that we can update." (Doc. 25-1 at 81). On June 30, 2015, Chamoun wrote Edwards: "[B]efore terminating [Knight and one other employee] we had 21 employees covered by BCBS. After this termination . . . the employee number covered is 19. Does COBRA apply?" (Doc. 25-1 at 81). On July 1, 2015, Edwards responded with

"COBRA does not apply for this group." (Doc. 25-1 at 81).

It is undisputed that at no time did Knight notify GTI that he wished to elect COBRA coverage or that he received medical charges that otherwise would have been covered by COBRA coverage. Knight concedes he joined his wife's healthcare plan through her employer shortly after his GTI discharge.

## III.  ANALYSIS

### A.  <u>Summary Judgment Will Be Granted to the Defendant on the Denial of Reasonable Accommodations Claim in Count Two</u>

An entity covered by the ADA discriminates by

not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C.A. § 12112(b)(5)(A); *see also* 29 C.F.R. § 1630.9(a) ("It is unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business.").

To state a prima facie claim for failure to accommodate under the ADA, the plaintiff must show that: (1) [he] is disabled; (2) [he] is a qualified individual; and (3) [he] was discriminated against by way of the defendant's failure to provide a reasonable accommodation. "The

plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows [him] to perform the job's essential functions."

*Bagwell v. Morgan Cty. Comm'n*, 676 F. App'x 863, 865 (11th Cir. 2017) (citing and quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)).

The Plaintiff does not argue that he requested any accommodation which was denied. Indeed, it is undisputed that the Plaintiff was never denied any breaks (the accommodation he requested) either before he formally requested them, or after. Instead, he argues that he was fired so that he would not have to be accommodated in the future. In his brief in response to the motion for summary judgment he writes:

> A reasonable jury could find that Plaintiff, or his doctor on his behalf, requested such an accommodation prior to his termination when he provided a note from his doctor communicating his need to take occasional breaks for his diabetes. Based on the evidence presented above, a reasonable jury could find that Defendant terminated Plaintiff, at least in part, to avoid providing that reasonable accommodation going forward. Accordingly, summary judgment should be denied on Plaintiff's reasonable accommodation claim.

(Doc. 33 at 32) (citations omitted) (*see also* doc. 33 at 28 ("A reasonable jury could find that Defendant terminated Plaintiff to avoid accommodating Plaintiff's disability going forward.")).

The Plaintiff provides no authority, or argument, that the Eleventh Circuit has recognized a claim for denial of reasonable accommodations in the future.

Furthermore, this Court finds that such a claim conflicts with the language of the third element of the prima facie case which requires the <u>Plaintiff</u> to demonstrate that he "<u>was discriminated against</u> by way of the defendant's <u>failure to provide</u> a reasonable accommodation." *Bagwell*, 676 F. App'x at 865 (emphasis added). The Plaintiff is actually arguing either a retaliation claim[33], or a straight discrimination claim that the Plaintiff was fired "because of" his disability.[34] The former type of claim is not made in this case. The latter is made in Count One.

Because there is no genuine issue of material fact that the Plaintiff was provided all accommodations for which he asked (and did not ask), and because the Court holds that the claim in Count Two can only be based on a <u>past</u> denial of an accommodation, summary judgment will be granted as to the failure to accommodate claim, and Count Two will be dismissed.

### B. <u>Summary Judgment Will Be Granted to the Defendant on the Termination in Violation of the ADA Claim in Count One</u>

Under the ADA, it is unlawful for an employer to discriminate on the basis of disability in regards to the "terms, conditions, and privileges of employment," including "discharge of employees." 42 U.S.C. § 12112(a). "Employees may claim

---

[33] *See Bagwell v. Morgan Cty. Comm'n*, 676 F. App'x 863, 869 (11th Cir. 2017) (claiming that his employer fired him for making a request for accommodation)

[34] *See* 42 U.S.C. §1221(a).

unlawful discrimination under the ADA by showing either that the employer's facially neutral conduct had a disparate impact on members of a protected class (disparate impact) or that the employer treated certain employees worse than others because they possessed a protected trait (disparate treatment)." *Norris v. GKN Westland Aerospace, Inc.*, 921 F. Supp. 2d 1308, 1313 (M.D. Ala. 2013) (Thomson, J.) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52–53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003)). In the instant case, the Plaintiff claims that he was subjected to "disparate treatment" when the Defendant "terminated . . . and failed to reinstate him." (Doc. 1 at 7). The Eleventh Circuit has noted:

> We analyze ADA discrimination claims under the *McDonnell Douglas* burden-shifting analysis applied to Title VII employment discrimination claims. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir.2000). Under that framework, a plaintiff-employee first establishes a prima facie case of discrimination. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir.2004). To establish a prima facie case of ADA discrimination, a plaintiff must show (1) a disability, (2) that she was otherwise qualified to perform the job, and (3) that she was discriminated against based upon the disability. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir.2004). The burden then shifts to the defendant to articulate a legitimate reason for its employment action. *Wilson*, 376 F.3d at 1087. If it can, the burden shifts back to the plaintiff to offer evidence that the reason is pretextual. *Id*. If the plaintiff fails to show pretext, we affirm the grant of summary judgment on that ground. *EEOC v. Total Sys. Servs.*, 221 F.3d 1171, 1177 (11th Cir.2000). Where the defendant has met its burden of articulating a legitimate, non-discriminatory reason for its action, we may assume without deciding that the plaintiff has established a prima facie case and decide the case on the question of pretext. *See, e.g.,*

*Holifield v. Reno*, 115 F.3d 1555, 1564 (1997); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1243 (11th Cir.2001).

*Thomas v. Dolgencorp, LLC*, 645 F. App'x 948, 950–51 (11th Cir. 2016).[35]

### 1. *The Plaintiff Has Not Established a Prima Facie Case of Discrimination*

There is no dispute that the Plaintiff has a disability, diabetes, and that he was otherwise qualified to perform his job. In this case, the parties dispute only the third element of the Plaintiff's prima facie case–whether he was discriminated against based upon the disability.

### a. The Complaint Alleges Only that the Plaintiff's Termination Was Discriminatory

---

[35] The *McDonnell Douglas* analysis applies to claims, such as the instant claim, which are based on <u>circumstantial</u> evidence. The Plaintiff's brief argues that:

> Plaintiff also has <u>direct evidence</u> of a causal connection between his syncope episode and Lee Chamoun's decision to take adverse employment actions. After Plaintiff passed out from low blood sugar at work, Chamoun created a "warning notice" regarding the June 9, 2015 incident. On this warning form, which Plaintiff never saw, Chamoun checked the boxes for "conduct" and "insubordination" and also modified the form to read "gross misconduct" and "gross insubordination," showing his intent to create a pretext for terminating Plaintiff because of his diabetes <u>and supporting an inference</u> that such actions were taken because he regarded Plaintiff as having diabetes.

(Doc. 33 at 22-23) (emphasis added). This argument, which alleges that the evidence creates only an "inference" of discrimination, misunderstands the concept of direct evidence. "Direct evidence is 'evidence, that, if believed, proves [the] existence of [a] fact <u>without inference or presumption</u>.'" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (emphasis added) (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir.1997)).

The Plaintiff argues that "a reasonable jury could find that Defendant took adverse action**s** [(plural)] against [the] Plaintiff, including terminating his employment because of his diabetes." (Doc. 33 at 20-21).[36] The Plaintiff states that "[a]lmost immediately after learning that Plaintiff had diabetes [after the June 9, 2015 passing out incident], Chamoun began taking adverse employment actions against him" in the form of "creating post-hoc documentation of alleged performance and conduct issues dating back to December, 2014." (Doc. 33 at 21). He argues that "[a] reasonable jury could . . . find that the warning notices were all created by Lee Chamoun after Plaintiff's June 9, 2015[,] . . . [passing out] episode." (Doc. 33 at 22). Later, he also references the warning created for the June 9, 2015, incident. (Doc. 33 at 22-23).

First and foremost, the Complaint alleges only <u>one</u> adverse action–the Plaintiff's termination. (*See* doc. 1 at 7-9). "A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates,*

---

[36] The prima face case is sometimes stated as follows:

> A plaintiff asserting a disability discrimination claim must establish that []he (1) has a disability; (2) is qualified for the job, with or without reasonable accommodations; and (3) <u>suffered an adverse employment action because of [his] disability</u>.

*Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 893–94 (11th Cir. 2013) (citing *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir.1998)) (emphasis added).

*McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Furthermore, the Plaintiff's argument that the creation of these warnings was discriminatory is without merit. First, it contradicts Knight's <u>deposition testimony</u> where he states that he informed the Defendant of his diagnosis "years before [his] employment ended." (Doc. 25-2 at 40(156)). Second, assuming that <u>Chamoun</u> only knew about the Plaintiff's condition after June 9, 2015, there is no evidence that all (or any) of the "warnings" in this case were created after the June 9, 2015, episode, except for the one which concerned the episode which occurred on that date. The Plaintiff's argument is based on the following exchange in Chamoun's deposition:

> Q.      Did you write all of these warnings up on the day these events happened?
>
> A.      No, sir. This was not the day it happened. When Ron disappeared from work for four days, we assumed he's not coming back. Then he returned. And we knew then that he's not -- he just left the job without notice, without asking for pay request.

(Doc. 25-4 at 13(45)). This exchange concerned only <u>one</u> warning, dated January 15, 2015, in which Chamoun wrote that "Ron has not been to work for 4 days and has not presented to us a vacation or time off request as per GTI policy." (Doc. 25-4 at 40; *see also* doc. 25-4 at 12(44)-13(45)). Even if the Court assumes that none of the warnings were created at the time of the events in question, there is no evidence to suggest that <u>all</u> (or even <u>any</u>) of them were created <u>after</u> June 9, 2015, except, again,

the one which related to the episode which occurred on that date. Chamoun testified that each warning, no matter when it was created, memorializes events which occurred <u>on the date shown thereon</u>. The Plaintiff is merely speculating.

Further, it is undisputed that no action was taken against the Plaintiff as a result of the creation of the warnings themselves.[37] The Plaintiff states that these "warnings" were never shown to or discussed with him. "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Menzie*, 549 F. App'x at 894 (internal quotations and citations omitted). "If an action has no effect on an employee, it is not an adverse employment action." *Clark v. Potter*, 232 F. App'x 895, 896 (11th Cir. 2007) (citing *Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir.2004)). The only alleged act of discrimination which the Court will consider is the Plaintiff's termination.

### b. There Is No Evidence that the Plaintiff Was Fired Because He Has Diabetes

### (1) The Plaintiff Has No Comparators

The Eleventh Circuit has stated:

---

[37] The Defendant argues that <u>the conduct described in each warning was a factor</u>, but the creation of the warnings themselves had no impact on the Plaintiff.

> To establish unlawful disparate treatment, a plaintiff generally must demonstrate that his employer treated similarly situated employees outside of his protected class more favorably than he was treated. *See Burke–Fowler v. Orange Cnty., Fla.,* 447 F.3d 1319, 1323 (11th Cir.2006). When the plaintiff alleges . . . that other employees engaged in similar []conduct [as he] but were not similarly disciplined, the plaintiff must produce evidence that "the quantity and quality of the comparator's []conduct [was] nearly identical." *McCann v. Tillman,* 526 F.3d 1370, 1373 (11th Cir.2008) (quotation marks omitted).

*Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012) (ADA).

The Plaintiff never explicitly argues comparator evidence. However, in the context of his argument that the Defendant's stated reasons for his termination were a mere pretext for discrimination, the Plaintiff states:

> after Plaintiff's termination Defendant re-hired a former employee, Mike Jones, as a contractor to perform the same kind of unskilled electrician labor that Plaintiff had been performing before his termination.

(Doc. 33 at 24).[38] This argument is based on Chamoun's testimony that Mike Jones "is multitasked, like everybody else at the company" and performed non-skilled labor such as "bathroom receptacle, cleaned warehouse, technician, LTE." (Doc. 25-4 at 27(102)). That comment cannot fairly be read to mean that that was all Jones did. Further, the Plaintiff ignores Bowerman's sworn declaration in which he states that Jones could <u>also</u> perform technical electrical tasks such as integration and fiber optic

---

[38] Jones is apparently proffered to rebut the Defendant's argument that the Plaintiff was fired because of the downturn in the Defendant's work, and because there was no work for purely a "helper" any longer.

work on telecommunications job sites, something Knight could not do.[39] Jones is not a valid comparator.

### (2) There Is No Other Evidence Creating an Inference of Discrimination

The Eleventh Circuit has noted that

> a plaintiff will survive summary judgment even without comparator evidence as long as he presents some other circumstantial evidence that raises a question of fact as to the employer's discriminatory intent. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("[E]stablishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.").

*Banks v. iGov Techs., Inc.*, 661 F. App'x 638, 644 (11th Cir. 2016). Of course, in the instant case it is <u>undisputed</u> that "[n]o medical condition—known or unknown—played any role in the decision to discharge Knight." (Doc. 24 at 14, ¶11 (proffered by Defendant and not disputed by Plaintiff). Even if the Court assumes that that admission was an oversight by the Plaintiff, in his deposition Knight could articulate no basis for any such claim:

Q.    Okay. Did doctors tell you that General Telecom was letting you go because you have a disability?

---

[39] As noted above, other individuals were hired and/or retained by the Defendant. The Plaintiff does not argue that any of them are valid comparators, and there is nothing more than a passing discussion of any of them in the "argument" section of the Plaintiff's brief. Accordingly, the Court holds that none of them are valid comparators either.

A.	No.

Q.	Did [Chamouns] tell you that General Telecom was letting you go because it perceived you as disabled?

A.	No.

Q.	Did Dr. Chamoun tell you that any medical condition played a role in its decision to let you go?

A.	No.

Q.	Did anybody else tell you that?

A.	No.

Q.	Did Dr. Chamoun say anything leading you to believe your employment ended because you have a disability?

A.	No.

Q.	Did anybody else tell you that?

* * *

A.	No.

Q.	. . . Did Dr. Chamoun say anything leading you to believe General Telecom was ending your employment because it perceived you as disabled?

A.	No.

Q.	Did anybody else say anything leading you to that conclusion?

* * *

A.    No.

(Doc. 25-2 at 50(193-194)). Knight admitted in his deposition that he has no idea why he was selected for termination, who made the decision, or when it was made. (Doc. 25-2 at 50(195). When asked specifically if he knew "what any layoff decisions were based on," he answered "No." (Doc. 25-2 at 50(195)). Furthermore, the Plaintiff cites no evidence which calls into question whether there truly was a downtown in business, or the need to change the way crews were staffed.

Be that as it may, as noted above, the Plaintiff seems to be arguing that the warning notices prepared by Chamoun somehow prove that the Plaintiff's <u>termination</u> was because of his diabetes. (*See* doc. 33 at 21-23). Again, there is no evidence that any of the warnings themselves adversely affected the Plaintiff's employment. Even if, as the Plaintiff contends, every single warning was created after Chamoun learned of the Plaintiff's diagnosis (*see* doc. 33 at 21), no repercussions came from the <u>warnings</u>.[40]

The Plaintiff also argues that the warning notice created after the Plaintiff fainted, which alleged "Conduct" and "Gross insubordination" to be the Plaintiff's "Violations, " shows Chamoun's "intent to create a pretext for terminating the

---

[40] As is discussed in the next section, the Defendant's proffered reason for firing the Plaintiff was the downturn in GTI's business, and the Plaintiff's lack of qualifications for the few positions which remained.

Plaintiff because of his diabetes and supporting an inference that such actions were taken because he regarded the Plaintiff as having diabetes." (Doc. 33 at 22-23). Again, the Plaintiff fails to explain how this warning, which Chamoun states was created <u>only</u> to document the fact that the Plaintiff failed to follow instructions by refusing to go to the doctor after the incident, shows discriminatory intent, much less an adverse action.[41]

Because the Plaintiff has failed to provide evidence that his termination was because of his diabetes, he has failed to make out a prima facie case of disability discrimination. Summary judgment is therefore due to be granted in favor of the Defendant on the Plaintiff's disability discrimination claim in Count One.

2.    ***The Defendant Has Proffered a Legitimate Non-Discriminatory Reason for the Plaintiff's Termination***

Assuming that the Plaintiff had been able to establish a prima facie case of discrimination based on his diabetes, the burden would have shifted to the Defendant

> to produce evidence that its action was taken for a legitimate, non-discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff. However, the defendant's response must frame the factual issue with sufficient clarity so that the plaintiff

---

[41] Again, this is especially true when considering that the Defendant's proffered reason for terminating the Plaintiff was the downturn in work, not the warnings, nor the conduct alleged therein.

will have a full and fair opportunity to demonstrate pretext. The defendant may not satisfy its burden by presenting a hypothetical reason for the employment decision in question.

*Voudy v. Sheriff of Broward Cty. Florida*, No. 16-12059, 2017 WL 2983892, at *4

(11th Cir. July 13, 2017) (internal quotations and citations omitted).

In the instant case, the Defendant, in his initial brief, writes:

> Every reason offered was true. Business conditions in the industry generally have created a severe downturn in GTI's business in the years leading up to discharge. Crews that previously could contain three or four—room for a helper who cannot operate the GPS and who has no certifications or skills enabling him to perform multiple tasks—in contracts going forward may contain only one. Generator installation (as distinguished from maintenance) work with significant labor and simple tasks for which a helper was needed is gone for the foreseeable future. Like others separated for lack of work, there simply was no need any longer for what Knight did when he worked. Even when he worked, those experienced in his tasks concluded that he worked at a pace so slow that it simply was not sustainable for what customers wanted done. Decisionmaker Dr. Chamoun's judgment that Knight's pattern of conduct culminating in belligerence and refusing to follow necessary directives proved prescient when others reported his post-employment threats and his next employer fired him for that reason.

(Doc. 24 at 24-25) (internal citations omitted).

It is important to note what the Defendant does <u>not</u> clearly articulate–that the Plaintiff's insubordination and violation of work rules were the reason for his termination. While the Defendant discusses "Knight's pattern of conduct," and there is sufficient evidence in the record to create a genuine issue of material fact as to

whether such instances played a part in the Plaintiff's termination[42], the Court cannot say that this vague reference in the Defendant's brief "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Voudy*, 2017 WL 2983892, at *4. The court deems the Defendant's articulated legitimate non-discriminatory reason to be only the lack of work for which the Plaintiff was suited.[43]

---

[42] For example, Chamoun testified that he terminated Knight

> [a]fter extreme deliberation on my part and evaluating Mr. Knight's incompetence, Mr. Knight's gross misconduct, and after our lack -- occurrence of lack of work, and after Mr. Knight has violated repetitively the terms of his probation from 2014, the termination and rehiring.

(Doc. 25-4 at 19(69)); *see also* doc. 25-4 at 30(114)) (explaining that Knight was terminated for "lack of work," and "[inefficiency], gross misconduct, and violating the terms of his probation from his termination and rehiring of 2014."); doc. 25-4 at 31(120)-32(121)) (explaining that Chamoun told the Plaintiff that he was being fired "[d]ue to the lack of work, his inefficiency, his gross misconduct, and his violation of his probation time."); doc. 31-1 (Defendant's discovery responses explaining that "Plaintiffs employment was terminated because of lack of available work and because Plaintiff engaged in gross misconduct, gross insubordination, and company policy violations including violations of the company drug testing policy, violations of policy regarding attendance and smoking, smoking on GTI property, job sites, and near flammable liquids and gases subjecting employees to danger, refusing and failing to perform assigned work and/or otherwise displaying poor work performance, destroying company and/or customer property in an intentional and gross manner, and engaging in violent and threatening behavior.").

[43] In its reply brief, the Defendant argues that the Plaintiff was chosen to be laid off: 1) because he was less trained and efficient than others who worked there, and 2) because of the alleged rules violations. *See e.g.* doc. 37 at 9 ("It is undisputed Knight and others were discharged as part of a reduction-in-force necessitated by adverse business conditions and GTI's loss of a contract after Knight's June 9, 2015 episode. GTI undisputedly chose Knight based on his lack of required skills and the aggregate of his misconduct.") (emphasis added). Had this phrasing been used in the Defendant's initial brief, the Court would have considered this to be sufficient. However, "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court." *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1353 (11th Cir. 2005).

### 3. The Plaintiff Cannot Establish that the Reason for His Termination Is a Pretext for Discrimination

The Eleventh Circuit has stated that

> "[t]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir.1993) (citation omitted). A reason is not pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

*Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

In the instant case, it is <u>undisputed</u> that one person crews were becoming the norm at GTI and that only individuals with climbing certifications perform work climbing cell phone towers to install or maintain equipment, and only those able to operate the truck GPS can serve on one-person crews. Because Knight lacked skills necessary for work available following changes in the telecommunications industry and loss of work with customer General Dynamics beginning on June 13, 2015, Knight was discharged as part of a reduction in force during the third week of June 2015.[44] The

---

[44] The Plaintiff tries to show pretext by recasting the above as merely an argument that Knight was fired for "lack of work." (*See* doc. 33 at 24 ("Defendant's brief focuses on the idea that Plaintiff was terminated for alleged 'lack of work.'")). To be sure, the Defendant does use the phrase "lack of work" in its brief, but that is an oversimplification of its argument. Specifically, the Defendant argues that "[l]ike others separated for lack of work, there simply was no need any longer <u>for what Knight did</u> when he worked." (Doc. 24 at 25). However, the <u>entire</u> quote in which that line appears reads:

> Crews that previously could contain three or four—room for a helper who cannot

evidence regarding the downturn in work, and Knight's lack of qualifications, is undisputed.

Furthermore, it is undisputed that Chamoun received reports that the Plaintiff's work was "beyond slow." (Doc. 25-1 at 5, ¶12. a.). Knight fails to dispute any of the statements witnesses have made regarding his efficiency issues and work ethic. However, in his deposition, he does state: "[N]obody talked to me about work performance or anything. I've always worked hard, always did my job, and I always did the best I could." (Doc. 25-2 at 39(151)). Assuming that this is sufficient to create a genuine issue of material fact as to whether he actually <u>had</u> efficiency and work ethic issues, "merely showing that the employer was mistaken is not sufficient to show pretext." *Chapman v. AI Transp.*, 229 F.3d 1012, 1055 (11th Cir. 2000). "The inquiry is not whether an employee was guilty of misconduct, but whether the employer in good faith believed that the employee had done wrong and whether that belief was the reason for the termination." *Holmes v. Jefferson Cty. Sch. Dist.*, 657

---

operate the GPS and who has no certifications or skills enabling him to perform multiple tasks—in contracts going forward may contain only one. Generator installation (as distinguished from maintenance) work with significant labor and simple tasks for which a helper was needed is gone for the foreseeable future. Like others separated for lack of work, there simply was no need any longer for what Knight did when he worked.

(Doc. 24 at 24-25). Clearly, the Defendant does not contend that Knight was let go merely for "lack of work." Instead, it is arguing that it had to be more selective in who was on the crews–opting for individuals who had more qualifications than the Plaintiff.

F. App'x 874, 876 (11th Cir. 2016) (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). The Plaintiff has presented no evidence which shows that Chamoun did not, in good faith, believe that Knight actually had efficiency and work ethic issues.[45]

Still, the Plaintiff argues that "a reasonable jury could find that Plaintiff's job continued to be performed after his termination, showing that this reason, too, is pretext, as his crew continued to go out to jobs on the day he was sent home." (Doc. 33 at 24). This argument is based only on the following exchange which took place in the Plaintiff's deposition:

> Q.      And when you arrived at General Telecom the next morning [after receiving the text saying not to come to work], was Jeff Bowerman there?
>
> A.      Yes.
>
> Q.      All right. And did he tell you that there was no available work and to wait until you heard something further?
>
> A.      No. They were loading up a truck to get ready to go to work. He did not say that there was no work.
>
> Q.      Okay. What did he tell you?
>
> A.      He said I was going to have to see Lee [Chamoun].

---

[45] Assuming that the Defendant <u>had</u> articulated the Plaintiff's workplace conduct as an additional legitimate non-discriminatory reason for his termination, the Plaintiff's claim would also have failed because he has not shown that the Defendant did not have a good faith belief that that conduct actually occurred.

Q.     All right. Did he tell you there was no available work for you in particular?

A.     No.

(Doc. 25-2 at 49(189-190)). Again, this exchange only establishes that the crew continued to work, not that the Defendant did not legitimately eliminate the Plaintiff from the crew because of the need to pare it down, and the Plaintiff's lack of sufficient qualifications to work alone.  For this same reason, the Court rejects the Plaintiff's argument that the Defendant's reason was a pretext for discrimination because "every other member of his crew remained employed." (Doc. 33 at 24).[46]

The Plaintiff argues that the Defendant's admission that its business had begun a downturn in 2014, demonstrates that its termination of the Plaintiff in 2015 for business reasons is a pretext for discrimination. This argument ignores the undisputed fact that the Defendant also laid off two other workers at the same time as the Plaintiff, neither of whom is alleged to have been disabled. Furthermore, the impetus for the Plaintiff getting laid off was GTI losing the General Dynamics contract, which occurred on June 13, 2015. Despite the downturn that began in 2014, the General Dynamic contract still provided work in the form of the installation and maintenance

---

[46] The Court has already addressed, in the preceding section, the Plaintiff's argument that the hiring of Mike Jones demonstrates pretext. It does not.

of generators at customer sites which often required a "helper" such as the Plaintiff. There is no dispute that that type of work was mostly gone after the completion of the General Dynamics contract. The Plaintiff admits that he has no evidence which contradicts the Defendant on this point.[47]

Finally, the Plaintiff argues that the text Bowerman sent to the Plaintiff telling him not to work is evidence that the real reason for the Plaintiff's termination was his diabetes. (Doc. 33 at 27). Specifically, he states that:

> [a] reasonable jury could infer that this text was sent, and that Plaintiff's employment was terminated, because of a belief by Bowerman or Chamoun that Plaintiff's diabetes somehow impaired him from working

---

[47] The Plaintiff's argument ultimately is that the Court should consider the temporal proximity between the Plaintiff's discharge and his revelation to Chamoun that he had diabetes. "[T]emporal proximity alone does not establish pretext. *Jackson v. Hennessy Auto*, 190 F. App'x 765, 768 (11th Cir. 2006) (citing *Wascura v. City of South Miami*, 257 F.3d 1238, 1244–45 (11th Cir.2001)). The Plaintiff also argues that, considering this temporal proximity, and the Defendant's "flurry of activity to create post-hoc documentation for alleged performance and conduct issues" (doc. 33 at 25), this Court should ignore the fact that he cannot satisfy his burden under *McDonnell Douglas* because

> establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case. . . . Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). The Plaintiff has produced no such circumstantial evidence that GTI intended to discriminate against him because he has diabetes. Additionally, his temporal-proximity argument is directly contradicted by his own deposition testimony that he informed the Defendant of his diabetes "years before [his] employment ended." (Doc. 25-2 at 40(156)).

in the heat, supporting a conclusion that Defendant "subjected [Plaintiff] to a prohibited action because of an actual or perceived physical or mental impairment." 29 CFR 1630.2.

(Doc. 33 at 27). This argument is based, in part, on the portion of Bowerman's deposition where he stated that "the heat will make you sick if you're . . .." (Doc. 33 at 27). The Plaintiff contends that Bowerman meant to (but did not) finish this sentence with the words "a diabetic." (*Id.*).

Even if Bowerman and/or Chamoun believed that working in the heat would make the Plaintiff sick <u>because</u> he was a diabetic, that does not mean that Chamoun fired him <u>for that reason</u>.[48] In any case, it does not rebut the Defendant's explanation regarding the downturn in business, and the reports of the Plaintiff's inefficiency.

Summary judgment is due to be granted to the Defendant as to his discrimination claim in Count One, for the additional reason that the Plaintiff has failed to demonstrate pretext.[49]

### C.    The COBRA Violation Claim in Count Three

The Plaintiff alleges that "[u]pon his termination, a qualifying event, Defendant failed to given notice to Plaintiff of his COBRA rights within the time allowed by statute." (Doc. 1 at 11, ¶61). Federal law provides:

---

[48] Both Bowerman and Chamoun's brother, Joe Chamoun, the head of GTI, are diabetics.

[49] Because the Court finds that the discrimination claim is due to be dismissed, it will not address the Defendant's after-acquired evidence defense. (*See* doc. 24 at 26).

The plan sponsor of each group health plan shall provide . . . that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

29 U.S.C.A. § 1161(a).

## 1. *There Is No Genuine Issue of Material Fact that GTI Did Not Provide the Notice Required by COBRA*

The Plaintiff argues that there is no genuine issue of material fact that the notice <u>was not</u> sent to him. (Doc. 31 at 15-18). He moves for summary judgment on that issue. The Defendant neither responds to this argument, nor moves for summary judgment on this issue.[50] Regardless, there is no dispute in this case that the <u>only</u> notice which <u>might</u> have been sent to the Plaintiff was the notice contained in the "release" which GTI claims it gave to the Plaintiff's wife when she picked up his last paycheck, and which provided, regarding COBRA coverage:

"Releasor" acknowledges that this is a notification of the rights to elect Cobra [sic] continuation coverage, if terminated or hours reduced, with similar benefits to company plan at Releasor's own expense for 18 to 36 months. "Releasor" acknowledges that details of Cobra [sic] can be obtained from the cfo of GENERAL TELECOM, INC. 1000 Powder Plant Rd, Bessemer, Alabama 35022, Phone # 205-428-8455.

(Doc. 25-4 at 38).

The Court assumes, without deciding, that: 1) it is acceptable under the

---

[50] On this issue, the Defendant's initial argument (doc. 24 at 27-32) and its response to the Plaintiff's motion (doc. 35 at 7-14) are essentially identical.

circumstances of this case for the Plaintiff's wife (as opposed to the Plaintiff directly) to be given the release; 2) that GTI actually gave the release to the Plaintiff's wife; and 3) that the Plaintiff received the release from his wife.[51] Be that as it may, the release was not a proper COBRA notice because it did not contain most of the information required by applicable regulations.[52] Accordingly, it is inadequate as a

---

[51] All of these contentions are disputed by the Plaintiff.

[52] Federal regulations require that the notice

(4)      . . . shall be written in a manner calculated to be understood by the average plan participant and shall contain the following information:

(i) The name of the plan under which continuation coverage is available; and the name, address and telephone number of the party responsible under the plan for the administration of continuation coverage benefits;

(ii) Identification of the qualifying event;

(iii) Identification, by status or name, of the qualified beneficiaries who are recognized by the plan as being entitled to elect continuation coverage with respect to the qualifying event, and the date on which coverage under the plan will terminate (or has terminated) unless continuation coverage is elected;

(iv) A statement that each individual who is a qualified beneficiary with respect to the qualifying event has an independent right to elect continuation coverage, that a covered employee or a qualified beneficiary who is the spouse of the covered employee (or was the spouse of the covered employee on the day before the qualifying event occurred) may elect continuation coverage on behalf of all other qualified beneficiaries with respect to the qualifying event, and that a parent or legal guardian may elect continuation coverage on behalf of a minor child;

(v) An explanation of the plan's procedures for electing continuation coverage, including an explanation of the time period

during which the election must be made, and the date by which the election must be made;

(vi) An explanation of the consequences of failing to elect or waiving continuation coverage, including an explanation that a qualified beneficiary's decision whether to elect continuation coverage will affect the future rights of qualified beneficiaries to portability of group health coverage, guaranteed access to individual health coverage, and special enrollment under part 7 of title I of the Act, with a reference to where a qualified beneficiary may obtain additional information about such rights; and a description of the plan's procedures for revoking a waiver of the right to continuation coverage before the date by which the election must be made;

(vii) A description of the continuation coverage that will be made available under the plan, if elected, including the date on which such coverage will commence, either by providing a description of the coverage or by reference to the plan's summary plan description;

(viii) An explanation of the maximum period for which continuation coverage will be available under the plan, if elected; an explanation of the continuation coverage termination date; and an explanation of any events that might cause continuation coverage to be terminated earlier than the end of the maximum period;

(ix) A description of the circumstances (if any) under which the maximum period of continuation coverage may be extended due either to the occurrence of a second qualifying event or a determination by the Social Security Administration, under title II or XVI of the Social Security Act (42 U.S.C. 401 et seq. or 1381 et seq.) (SSA), that the qualified beneficiary is disabled, and the length of any such extension;

(x) In the case of a notice that offers continuation coverage with a maximum duration of less than 36 months, a description of the plan's requirements regarding the responsibility of qualified beneficiaries to provide notice of a second qualifying event and notice of a disability determination under the SSA, along with a description of the plan's procedures for providing such notices,

matter of law. *See, Griffin v. Neptune Tech. Grp.*, No. 2:14CV16-MHT, 2015 WL 1635939, at *12 (M.D. Ala. Apr. 13, 2015) (Thompson, J.) (Denying summary judgment to employer which contended that it has provided the notice, where the notice did not contain most of the items required by the regulation).

Summary judgment will be granted in favor of the Plaintiff, and against the Defendant, on the issue of whether a proper COBRA notice was provided to the

---

including the times within which such notices must be provided and the consequences of failing to provide such notices. The notice shall also explain the responsibility of qualified beneficiaries to provide notice that a disabled qualified beneficiary has subsequently been determined to no longer be disabled

(xi) A description of the amount, if any, that each qualified beneficiary will be required to pay for continuation coverage;

(xii) A description of the due dates for payments, the qualified beneficiaries' right to pay on a monthly basis, the grace periods for payment, the address to which payments should be sent, and the consequences of delayed payment and non-payment;

(xiii) An explanation of the importance of keeping the administrator informed of the current addresses of all participants or beneficiaries under the plan who are or may become qualified beneficiaries; and

(xiv) A statement that the notice does not fully describe continuation coverage or other rights under the plan, and that more complete information regarding such rights is available in the plan's summary plan description or from the plan administrator.

29 CFR § 2590.606-4(b)(4) (emphasis added). In addition, subsection (b)(v) requires "[a]n explanation of the plan's procedures for electing continuation coverage, including an explanation of the time period during which the election must be made, and the date by which the election must be made." 29 C.F.R. § 2590.606–4(b)(v).

Plaintiff. The Court affirmatively holds that there is no genuine issue of material fact that such notice <u>was not</u> provided to the Plaintiff.

### 2. *A Genuine Issue of Material Fact Exists as to Whether the Plaintiff Was Terminated for Gross Misconduct*

The Defendant argues that the Plaintiff was not entitled to a COBRA notice because he was fired for "gross misconduct." Termination for "gross misconduct" is not a "qualifying event." 29 U.S.C. §1163(2); *see also*, *DeBene v. BayCare Health Sys., Inc.*, 688 F. App'x 831, 838–39 (11th Cir. 2017) ("Termination for reasons other than an employee's gross misconduct is a qualifying event.").[53]

### a. **Some of the Conduct Alleged Is "Gross Misconduct"**

COBRA does not define "gross misconduct." The parties attempt to provide guidance to the Court by citing several cases from many other district courts, most of which are from other circuits. After reviewing same, the Court agrees with the observation of one court that "[n]o uniform definition of gross misconduct exists." *Zickafoose v. UB Services, Inc.*, 23 F.Supp.2d 652, 655 (S.D.W.Va.1998) (Chambers, J.). The only guidance from the Eleventh Circuit on this issue comes from *Virciglio v. Work Train Staffing LLC*, 674 F. App'x 879, 891 (11th Cir. 2016), an unreported decision, where the Eleventh Circuit noted that

---

[53] Recall that the Defendant argues for most of its brief that the impetus for firing the Plaintiff was the downturn in its business, combined with the Plaintiff's lack of qualifications to work alone.

we agree with the Seventh Circuit that it must involve something more than incompetence or unsatisfactory performance. *See Mlsna v. Unitel Commc'ns, Inc.*, 91 F.3d 876, 881 (7th Cir. 1996) ("job incompetence alone does not constitute gross misconduct for COBRA purposes"). In short, there is no evidence to suggest that Plaintiff was terminated for anything other than lackluster sales, which does not qualify as "gross misconduct" under COBRA.

*Virciglio v. Work Train Staffing LLC*, 674 F. App'x 879, 891 (11th Cir. 2016). Thus, *Virciglio* explained not so much what "gross misconduct" is but what it is not. Therefore, the Court must determine for itself what "gross misconduct" is.

When a statutory term is not defined in the statute itself the Court should "'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *United States v. Rodgers*, 466 U.S. 475, 479, 104 S. Ct. 1942, 1946, 80 L. Ed. 2d 492 (1984) (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)). As one Court has noted, "the adjective gross means outrageous, extreme or unconscionable. Accordingly, conduct is gross misconduct if it is so outrageous that it shocks the conscience. Such a definition necessitates a case by case fact-based analysis." *Zickafoose*, 23 F. Supp. 2d at 655. In *Zickafoose*, the Court held that the Plaintiff's savagely beating his co-worker to a point where she required five days of hospitalization, conduct which resulted in his being convicted of a felony, was gross misconduct. *Id*. at 656. In *Cotte v. Cooperativa de Ahorro y Credito Yabucoena*, 77 F. Supp. 2d 237, 241 (D.P.R. 1999) (Pieras, J.),

69

the district court used the same definition and held that misappropriation of company funds could be gross misconduct.

Gross misconduct has also been defined as "intentional, wanton, willful, or deliberate misconduct." *Nero v. Univ. Hosps. Mgmt. Servs. Org.*, No. 1:04CV1833, 2006 WL 2933957, at *4 (N.D. Ohio Oct. 12, 2006) (Aldrich, J.). In *Nero*, the Court held that

> the filing of lab results in the wrong chart or the mislabeling of a blood sample, though having potentially serious consequences, does not constitute gross misconduct absent any evidence that the action was intentional, wanton, willful, or deliberate. Similarly, failing to follow through with a patient referral or a prescription refill does not constitute gross misconduct absent any evidence that it was anything more than a mistake.

*Nero*, 2006 WL 2933957, at *5.

In *Collins v. Aggreko, Inc.*, 884 F. Supp. 450, 454 (D. Utah 1995) (Boyce, M.J.), the district court, defining gross misconduct as conduct which is "intentional, wanton, willful, deliberate, reckless or in deliberate indifference to an employer's interest," determined that driving a company vehicle while drunk qualified. *Aggreko*, 884 F. Supp. at 454. In *Nakisa v. Cont'l Airlines*, No. CIV. A. H-00-090, 2001 WL 1250267 (S.D. Tex. May 10, 2001) (Werlein, J.), the district court used that same definition, but added that "[a] deliberate violation or disregard of standards of behavior required by an employer or which an employer has a right to expect from

employees constitutes gross misconduct." *Id.* It then determined that the employee's conduct in "throw[ing] an apple toward a window of [a] plane and audibly . . . utter[ing] the word 'nigger' is far more than negligent conduct. [It was gross misconduct because it] demonstrates a substantial and deliberate indifference to Continental's clear interests in customer and employee relations." *Id.* at *3. Similarly, the Sixth Circuit, in *Berry v. Frank's Auto Body Carstar, Inc.*, 495 F. App'x 623, 627 (6th Cir. 2012), affirmed a district court opinion which, using the same definition of "gross misconduct," had held that

> [s]creaming profanities at another employee, making hand gestures toward the employee (which others believed to be threatening), saying the employee would "get" hers and generally seeming to be out of control is conduct so manifestly so outrageous and extreme as to constitute gross misconduct.

*Berry v. Frank's Auto Body Carstar, Inc.*, 817 F. Supp. 2d 1037, 1047 (S.D. Ohio 2011) (Wehrman, J.), *aff'd*, 495 F. App'x 623 (6th Cir. 2012).

Other cases seem to use a combination of all the above methods. For example, in *Boudreaux v. Rice Palace, Inc.*, No. CIV.A. 04-541, 2006 WL 3345198 (W.D. La. Nov. 15, 2006) (Melancon, J.), the Court reviewed all of the above definitions and then found

> that defendants' proffered evidence supports their conclusion that plaintiff's improper use of prescription medication resulted in plaintiff's inability to properly and safely perform her duties. Moreover, such use was done in deliberate violation of the employer's standards of conduct

> imposed on employees, or carelessness or negligence of such a degree or recurrence as to manifest equal culpability, wrongful intent, or evil design aimed at causing injury to the employer or the employee's fellow workers; which falls within the proffered definitions of gross misconduct.

*Boudreaux,* 2006 WL 3345198 at *6 (internal quotations and citations omitted).

Similarly, in *Moore v. Williams Coll.*, 702 F. Supp. 2d 19, 24 (D. Mass. 2010) (Ponsor, J.), aff'd, 414 F. App'x 307 (1st Cir. 2011), the court held that the Plaintiff, who had been hired as a visiting lecturer at a college, was guilty of gross misconduct in that he falsely represented to the institution that he had a bachelor's degree, and in that he had committed criminal student aid fraud.

The Fourth Circuit has determined that "'flagrant, repeated insubordination' by a managerial employee" is "gross misconduct" for COBRA purposes. *Bryant v. Food Lion, Inc.*, 8 F. App'x 194, 196 (4th Cir. 2001). The decision in *Bryant* affirmed a district court's opinion, which had adopted the following standard:

> In this district, gross misconduct for management employees has been defined as "'substantial deviation from the high standards and obligations of a managerial employee that would indicate that said employee cannot be entrusted with his management duties without danger to the employer.'" *Karby v. Standard Prods. Co.*, 1992 WL 333931 at *6 (D.S.C. June 22, 1992).

*Bryant v. Food Lion Inc.*, 100 F. Supp. 2d 346, 376 (D.S.C. 2000) (Hawkins, J.), aff'd, 8 F. App'x 194 (4th Cir. 2001).

Finally, the undersigned, in *Colvin v. Peterson Indus., Inc.*, No.

4:13-CV-1458-VEH, 2015 WL 4067321, at *8 (N.D. Ala. July 2, 2015) (Hopkins, J.),

wrote:

> It has been noted that "COBRA ... does not provide a definition of 'gross misconduct' and federal case law addressing the subject is sparse." *Zickafoose v. UB Servs., Inc.*, 23 F.Supp.2d 652, 655 (S.D.W.Va.1998). At least one court has found that
>
>> Applying an ordinary meaning of the statutory terms, the adjective gross means outrageous, extreme or unconscionable. Accordingly, conduct is gross misconduct if it is so outrageous that it shocks the conscience. Such a definition necessitates a case by case fact-based analysis. One district court described gross misconduct as "misconduct beyond mere minor breaches of employee standards, but conduct that would be considered gross in nature." *Collins v. Aggreko, Inc*., 884 F.Supp. 450, 454 (D.Utah 1997).
>
> *Zickafoose*, 23 F.Supp.2d at 655. Gross misconduct has been found where an employee used a company vehicle without authorization and while intoxicated. *Aggreko*, 884 F.Supp. at 454 ("Such conduct is wanton and a deliberate disregard of his employer's interest.").

*Colvin*, 2015 WL 4067321, at *8 (emphasis added). In *Colvin*, this Court determined

that a threat to "gut" an employer while physically reaching for a knife, and a threat

to "gut [an employee's] bulldog ass if you get up, bitch," was gross misconduct.

Guided by the above case law, the Court will next examine whether the

conduct in which the Plaintiff was alleged to have engaged qualifies as gross

misconduct. The Defendant argues that:

Knight's individual acts of insubordination, including but not limited to,

failed and refused tests for illegal drugs and violent behavior on [work sites], are each enough alone to constitute "gross misconduct." Even if one event were not enough, Knight's cumulative insubordinate conduct taken together in the aggregate leaves no doubt.

(Doc. 24 at 28). Then it states:

Here, GTI's good faith belief Knight engaged in "gross misconduct" was based on the aggregate of (1) Knight's failed March 2014 drug test for which he continued employment on probationary status; (2) coworker reports and management's observation of Knight's work habits; (3) coworker reports of Knight's violent behavior, and (4) Knight's repeated refusal to follow Dr. Chamoun's instructions regarding smoking near dangerous chemicals and following procedure for workplace medical events[.]

(Doc. 24 at 29).

First, the Court agrees that Knight's original failed drug test, when combined with the refusal to take a drug test when instructed, would be gross misconduct. Further, violent behavior at a work site, such as swinging an axe wildly and destroying customer property, is gross misconduct. Also, the Court agrees that participating in dangerous activities such as smoking around dangerous materials is gross misconduct, especially when one is counseled multiple times and continues to do so. On the other hand, the Plaintiff's "work habits" are akin to "incompetence or unsatisfactory performance," which the Eleventh Circuit has stated is insufficient to qualify as "gross misconduct." *Virciglio*, 674 F. App'x at 891.

**b.** **There Is a Genuine Issue of Fact as to Why the Plaintiff Was Fired**

There is substantial evidence that the Plaintiff was not fired for gross misconduct. When asked in his deposition if there was "a reason you didn't fire him for [the fiber optic pedestal incident]?" Chamoun testified: "[m]y stupidity, my mistake, and my good heart." (Doc. 25-4 at 13(47)). The following exchange also took place:

Q.     And the reason you didn't fire him for that is the same? Correct?

A.     I should have fired him ten times already, but I didn't, yes.

(Doc. 25-4 at 12(48)). Chamoun also confirmed that he did not fire the Plaintiff for insubordination. (Doc. 25-4 at 12(41)). Furthermore, after the Plaintiff applied for worker's compensation benefits, the only reason Chamoun gave to the Alabama Department of Labor for the Plaintiff's discharge was "lack of work." (Doc. 25-4 at 32(122-123)).

Of course, Chamoun also testified that the Plaintiff was fired, at least in part, for these reasons. (Doc. 25-4 at 19(69)); doc. 25-4 at 30(114)); doc. 25-4 at 31(120)-32(121); *see also* doc. 31-1 (Defendant's discovery responses explaining that "Plaintiffs employment was terminated because of lack of available work and because Plaintiff engaged in gross misconduct, gross insubordination, and company policy violations including violations of the company drug testing policy, violations of

policy regarding attendance and smoking, smoking on GTI property, job sites, and near flammable liquids and gases subjecting employees to danger, refusing and failing to perform assigned work and/or otherwise displaying poor work performance, destroying company and/or customer property in an intentional and gross manner, and engaging in violent and threatening behavior."). In consideration of this conflict in the evidence, summary judgment will be denied to both parties on this issue.

### c. The Plaintiff Disputes that He Engaged in the Conduct Alleged

If the Defendant had argued in response to the claim for discrimination that the Plaintiff was fired for the "gross misconduct" alleged in this section, GTI's good faith belief, even if mistaken, that the Plaintiff engaged in such conduct would have been sufficient to defeat a claim for <u>discrimination</u>. However, under COBRA "the employer's belief that the employee engaged in gross misconduct must be more than its honest, actual belief—the record must demonstrate that the employee did indeed engage in gross misconduct." *See Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 680 (7th Cir. 1997); *Rodriguez v. Oriental Fin. Grp. Inc.*, 802 F. Supp. 2d 350, 357 (D.P.R. 2011) (Dominguez, J.) (same); *De Nicola v. Adelphi Acad.*, No. CV-05-4231, 2006 WL 2844384, at *7, n. 4 (E.D.N.Y. Sept. 29, 2006) (Trager, J.) (same); *Richard v. Indus. Commercial Elec. Corp.*, 337 F. Supp. 2d 279, 281 (D.

Mass. 2004) (Gorton, J.).[54] In this case, the conduct is disputed.

For example, the only incident in which it is alleged that the Plaintiff "refused tests for illegal drugs" is the one which occurred after the Plaintiff passed out. GTI claims that Chamoun and Bowerman told Knight that he had to have a drug test done that day, but the Plaintiff insists he was not told to do so that day, and the text sent by Chamoun to the Plaintiff, which states that the Plaintiff could take the test "today or tomorrow," supports the Plaintiff's version of events. The only incident of "violent behavior" which is alleged is the incident regarding "wildly flailing" an ax and the fiber optic pedestal, the first portion of which the Plaintiff denied, and the latter portion of which the Plaintiff claimed was an accident. Chamoun testified that when he counseled the Plaintiff, he was insubordinate, but, because the Plaintiff states that he was never counseled for rules violations, a jury could reasonably find that the acts of insubordination did not occur.[55]

Under the circumstances, and considering that additional proof at trial may reveal more, the Court will deny summary judgment to both the Defendant and the

---

[54] The Court is persuaded that this approach is the correct one. Regardless, the parties agree that this is correct. (*See* doc. 24 at 27 and note 100; doc. 31 at 23-24).

[55] Recall that the Court deemed "undisputed," for purposes of liability on the discrimination count, the Defendant's proffered facts concerning Knight smoking near dangerous chemicals. As explained previously (*supra* note 20), that fact is not deemed to be admitted as to the COBRA claim.

Plaintiff on the issue of whether the Plaintiff engaged in "gross misconduct."

### 3.    *The Small Employer Exception Does Not Apply*

The Plaintiff argues at length regarding the number of employees employed by the Defendant, and whether the Defendant falls within an exception to COBRA for employers which "normally employed fewer than 20 employees on a typical business day during the preceding calendar year." 29 U.S.C. §1161(b). The Defendant neither responds to this argument, nor asserts, in its own motion, that the exception applies. Accordingly, the Court determines that summary judgment is due to be granted in favor of the Plaintiff and against the Defendant on this issue. *See, Powell v. Am. Remediation & Envtl., Inc.*, 61 F. Supp. 3d 1244, 1253 (S.D. Ala. 2014), aff'd, 618 F. App'x 974 (11th Cir. 2015) (and cases cited therein) ("[W]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned."). The Court affirmatively holds that the small employer exception does not apply to the Defendant.

### 4.    *Prejudice and Bad Faith*

The Defendant argues that "[b]oth prejudice to the participant and bad faith by the administrator are relevant factors in assessing penalties." (Doc. 35 at 12). Since

the Court will be trying several factual issues regarding the COBRA claim, it will deny summary judgment to both sides on this issue and reserve judgment until the trial of this matter.[56] For the same reason, it will deny summary judgment to both parties as to the availability of attorney's fees on this issue.

## IV. CONCLUSION

Based on the foregoing, it is hereby **ORDERED, ADJUDGED**, and **DECREED** <u>only</u>[57] as follows:

1.     The Defendant's motion for summary judgment is **GRANTED** as to the

---

[56] There is no doubt that lack of prejudice and lack of bad faith are not <u>prerequisites</u> to a penalty under COBRA.  The Court is persuaded by, and adopts the following reason from Judge Kallon of this district:

> Because damages under COBRA are "designed more for the purpose of punishing the violator than compensating the participant," *Scott v. Suncoast Beverage Sales, LTD*, 295 F.3d 1223, 1232 (11th Cir. 2002), the court finds [the] argument that [the Plaintiff] suffered no prejudice from the failure to issue a notice unavailing. While "prejudice is a factor to be considered in determining the appropriate penalty," the Eleventh Circuit has "explicitly rejected treating prejudice as a prerequisite to a penalty." *Id*. (citation omitted). Likewise, [the] argument regarding the purported lack of bad faith misses the mark because the plan sponsor "is charged with knowledge of every provision of ERISA" and is "obligated, under ERISA, to determine employees' rights to continuation coverage and notify them of these rights." *Nat'l Companies Health Benefit Plan v. St. Joseph's Hosp. of Atlanta, Inc.*, 929 F.2d 1558, n. 15 (11th Cir. 1991) (citation omitted), *abrogated on other grounds by Geissal v. Moore Med. Corp.*, 524 U.S. 74 (1998); see also 29 U.S.C. § 1161(a).

*Virciglio v. Work Train Staffing, LLC*, No. 2:12-CV-3738-AKK, 2014 WL 12591416, at *5 (N.D. Ala. May 16, 2014), aff'd, 674 F. App'x 879 (11th Cir. 2016).

[57] The findings in this opinion are made in order to reach the conclusions set out herein. No party should deem any issue in this case to be resolved, except as set out in this section.

Plaintiff's claims for relief in Counts One and Two. Counts One and Two are hereby **DISMISSED with prejudice**.

2.　　In all other respects, the Defendant's motion is **DENIED**.

3.　　The Plaintiff's motion is hereby **GRANTED** as to the issue of whether the Plaintiff was sent the notice required to be sent him pursuant to 29 U.S.C.A. § 1161(a). The Court affirmatively holds that there is no genuine material fact, such that the Plaintiff is entitled to, and is hereby **GRANTED**, judgment as a matter of law that he was not sent said notice.

4.　　The Plaintiff's motion is hereby **GRANTED** as to the issue of whether the "small employer exception" applies to the Defendant. The Court affirmatively holds that there is no genuine material fact, such that the Plaintiff is entitled to, and is hereby **GRANTED**, judgment as a matter of law that the Defendant does not fall within that exception.

5.　　In all other respects, the Plaintiff's motion is hereby **DENIED**.

**DONE** and **ORDERED** this 27th day of September, 2017.

_____

**VIRGINIA EMERSON HOPKINS**
United States District Judge